Timothy Harris
Plaintiff Pro Se'
4005 Cherokee Rose Ave.
North Las Vegas, NV 89031
702-371-3658
Extremeps1@cox.net

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

Timothy Harris, Pro Se',

                Plaintiff(s),

         -vs-

WELLS FARGO AUTO FINANCE, LLC,

                Defendant(s).

CASE NO. 2:11-cv-00388-JCM-PAL

**PLAINTIFF'S REPLY TO DEFENDANTS
RESPONSE (Court Doc. # 18) AND
RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(Court Doc. # 20)**

    Plaintiff Timothy Harris, submits this reply and response to Defendant's Opposition to Plaintiff's Motion for Summary Judgment **(See PE-THWF-015 which is court doc. # 18 & 20)** and this will serve as Plaintiff's response to Defendant's Motion for Summary Judgment as well. A copy will be submitted for both responses. As Plaintiff is not an attorney, Plaintiff will do his best to respond to both the Defendant's pleading although they have been submitted as one and it is hard to define which is the response to Plaintiff's Motion for Summary Judgment and which is Defendant's own Motion for Summary Judgment.

## MEMORANDUM OF POINTS AND AUTHORITIES
### I.    INTRODUCTION

    Plaintiff alleged that Defendant Wells Fargo violated the FCRA 15 USC §1681, et seq by it's failure to mark the Plaintiff's reports with the credit bureaus in dispute after receiving notice of such dispute directly from the Plaintiff. Plaintiff then alleged in his complaint that the Defendant failed to perform and investigation into Plaintiff's dispute after Defendant received notice of the dispute directly from the Plaintiff. Plaintiff has

submitted copies of the certified mailings to the Defendant and all three major credit reporting agencies as evidence. **(see PE-THWF-001,002,003,004)**

Plaintiff has also submitted multiple copies of his credit reports since the aforementioned dispute letters had been received.  These reports show how only one report had been "marked or indicated" to be in dispute by the Defendant who is a subscriber to the services that the credit reporting agencies (CRA's) offer.  These reports do not match up completely when compared line for line and the dispute markings do not match up completely either, showing that the Defendant lacks the systems to properly handle disputes when informed by the consumers.  If even one line item is wrong on the Plaintiff's credit report, this would impact the Plaintiff's score and therefore damage the Plaintiff.  Look at the Differences between the August 3, 2011 reports and the September 12th, 2011 reports. **(see PE-THWF-009,014)**  It can easily be seen here how the report changes from one month to the next even though no payments have been made on the alleged account.  For example if a report shows the number of alleged payments marked in years instead of months that would change the FICO score.  If an alleged debt with a flat, one-time payment needed was marked as a revolving account then that would greatly affect the FICO score as well.

The Defendant would have this court believe that it did perform and investigation by the way of e-OSCAR which is a web based system that is nothing more than an abbreviated communication system which has so many flaws within its design and use that this is no way could constitute a reasonable investigation into Plaintiff's dispute. Plaintiff has requested the Defendant's training manuals to show the court how this e-OSCAR system works but the Defendant to date has failed to comply with those discovery requests as they state those requests are irrelevant and immaterial to the case at hand.  The Plaintiff has re-submitted those amended discovery requests with an anticipated answer date of September 28, 2011.  Plaintiff was now informed today that once again the Defendant has changed attorney (this will be the third one) and that the Defendant now needs one more week to answer these requests.  The Plaintiff has agreed to the Defendant's request for a one week extension as the Plaintiff is always willing to show good faith in this matter and to show that the Plaintiff is always willing to come to the table and settle with the Defendant should they ever decide to make an offer to the Plaintiff.

The Defendant would have this court believe that there is no private right of action allowed by the FCRA.  The following legal arguments will show that this just simply is not true.

## **LEGAL ARGUMENT**

In the Defendant's Response in Opposition and Motion for Summary Judgment **(see PE-THWF-015)** on page 2 the Defendant said that on September 10, 2008 the Plaintiff executed a note and security agreement for which he borrowed money.  As the Defendant has submitted nothing except bad copies of these documents and no originals and not even a sworn statement under penalty of perjury by the custodian of those documents which is the only legal verification of any alleged debt then this debt could not exist.  The Defendant has been asked in discovery to submit these documents with both front and back sides for inspection and to this date the defendant has not complied.  According to law**... Validation requires presentment of the account and general ledger statement signed, sworn and dated by the party responsible for maintaining the account**.  See Pacific Concrete F.C.U, v, Kauanoe, 62 Haw. 334, 614 P.2d 936 (1980); GE Cap/fa/ Hawaii, Inc. v. Yonenaka, 25 P.3d 807, 96 Hawaii 32 (Hawaii App 2001); Fooks v. Norwich Housing Authority, 28 Conn. L. Rptr. 371, (Conn. Super.2000); Town of Brookfield v. Candlewood Shores Estates, Inc., 513 A.2d 1218, 201 Conn. 1 (1986); and Solaon v. Godbole, 163 Ill. App. 3d 845, 114 Ill. Dec. 890, 515 N.E. 2d 1045 (3rd Dist 1987).  The Plaintiff has requested for these and to this date the Defendant has failed to comply.  Absent compliance from the Defendant this alleged debt cannot exist.

The Defendant also has stated that there is an affidavit under exhibit 2 of Defendants motion for summary judgment **(see PE-THWF-015)**.  No such affidavit exists or if it does this is one more thing the Defendant has forgotten, mis-placed or needs an extension on.  If such an affidavit exists it cannot be considered true an factual without the Plaintiff being able to examine it and being able to re-but such an affidavit with an affidavit of his own.  Until such a time as this missing document shows up...anything relating to it cannot be considered except as hearsay.

Plaintiff has requested in discovery the training and usage manuals from the Defendant in regards to their use of the e-OSCAR system and to this date, this request has been denied.  Until the Defendant can acquire those manuals either by the Defendant's answer to Plaintiff's discovery requests or by a Motion to Compel if the Defendant again fails to answer the amended discovery requests...all the Plaintiff can do to show the court about this system is submit an exhibit until Plaintiff's discovery requests have been complied with.  Please see the testimony of Leonard A. Bennett before the **HOUSE COMMITTEE ON FINANCIAL SERVICES dated June 19, 2007**

**(PE-THWF-016).** As you can see it is regular practice just to speed through these "investigations" and also that the way it is done can lead to so many inaccuracies in themselves by someone moving just a fraction of an inch and inadvertently marking a drag down box incorrectly and so on. When you really get down to the way the e-OSCAR system works…all it is, is a quick way for the furnisher of information (Defendant) to communicate with the CRA's to see if the reported information matches between the two entities. There is no opening up of the files to check for accuracy or anything else.

The Defendant again would try to cloud this court with statements made in their response to Plaintiff's Motion for Summary Judgment. On page 4 of this document in lines 3 through 6 the Defendant says that as of November 17, 2010 that both the Experian and Trans Union reports were showing disputed by the consumer. Take judicial notice that in their response the Defendant has admitted to receiving the dispute letter from the Plaintiff in June of 2010 and that the Defendant also received an Automated Consumer Dispute Verification (ACDV) with respect to the Plaintiff's reports, via the e-OSCAR system **(see PE-THWF-015) page 3 lines 4 through 9.**

The Defendant has admitted on record that they received dispute notification from both the Plaintiff and the CRA's in June of 2010 yet by their own admittance Experian did not show an indication of dispute until August 25, 2010 and Trans Union did not show any kind of indications of dispute until November 17, 2010. This is in complete violation of the FCRA. Also there is no proof from the Defendant that the Trans Union dispute indication was from the Defendant and not from the CRA itself. If it was from the Defendant why is the dispute wording completely different?

Plaintiff now shows the court the most current copy of his credit report dated September 12, 2011 **(see exhibit PE-THWF-014)** and submits that to this day his 3 reports are not exactly the same. The Experian report shows "150 days late" and the Equifax and Transunion reports show "Charge-off or Collections". If you look at the balances, you can see that Experian and Trans Union shows a high balance of $10,308.00 and Equifax shows a high balance of $8,499.00. As far as dispute notification, the Experian file shows **"Account in dispute - *reported by subscriber* (FCBA) - Account information disputed by customer"** The Trans Union report says **"Account information disputed by consumer"** If it please the court…The Trans Union account has been indicated in dispute by the CRA and this is evidenced by the wording listed above. The Experian account has been indicated in dispute by both the CRA and the Defendant that is why you see the same wording as in the Trans union

report and the different wording that explicitly says "reported by subscriber". The Defendant is a subscriber to the CRA's and reports to them at the least on a monthly basis if not more by way of their agreement with the CRA's which has been requested in discovery but has not been complied with to this date. Take judicial notice that to this day the Plaintiff's credit reports are still not completely the same and that the Equifax report still does not show an indication of it being in dispute at all, let alone whether such dispute would be by the Defendant or the CRA or possibly both. **(see PE-THWF-014)**

With all the issues relating to the Plaintiff's credit report that have been brought before this court we now have the issue of the Defendant entering into the Plaintiff's report again while in litigation which is punishable under Title 18 United States code. Plaintiff is entitled for summary judgment because Defendant has obtained Plaintiff's information under false pretenses § 619 Obtaining information under false pretenses [15 U.S.C. § 1681q]: Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under title 18, United States Code, imprisoned for not more than 2 years, or both. This issue will be brought up in another Motion for Summary Judgment to be filed by the Plaintiff in the up-coming days. The case law supporting this Motion is as follows:

Rice v. Montgomery Ward & Co., Inc. 450 F. Supp. 688, 670-72 (M.D. N.C. 1978) (Defendant violates FCRA if it obtains a consumer report on Plaintiff after Plaintiff institutes an action against defendant. Such an inquiry is impermissible.);

Bils v. Nixon, Hargrave, Devans & Doyle, 880 P.2d 743 (Ariz. App. 1994) (improper to get report to discover information which might be used in litgation); Duncan v. Handmaker, 149 F.3d 424, 426-28 (6th Cir. 1998) (no legitimate business needs to obtain report to prepare for litigation); Bakker v. Mckinnon, 152 F.3d 1007, 1011-12 (8th Cir. 1998) (same);

Auriemma v. Montgomery, 860 f.2d 273, 279, 280-281 (7th Cir. 1998) (extra-judicial I investigation by attorneys improper; no privilege);

Mone v. Dranow, 945 F.2d 306, 308 (9th Cir. 1991) (obtaining credit report to investigate for purposes of litigation improper);

Boothe v. TRW Credit Data, 557 F. Supp. 66, 70-71 (S.D.N.Y. 1982); Rylewicz v. Beaton Services, Ltd., 698 F. Supp.. 1391, 1400 n. 10 (N.D. Ill. 1988), aff'd 888F.2d 1175, 1181 (7th Cir. 1989); Houghton v. N.J. Maunfacturer's Ins. Co., 795 F.2d 1144,

1149 (3d Cir. 1986) (obtaining report after litigation for use in litigation improper).  As stated this issue will be brought up in a formal pleading in the near future.

## I.   OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1. To defeat Defendants motion for summary judgment, Plaintiff need not present any direct evidence of conscious or reckless disregard. Rather, he must merely present evidence from which the trier of fact could deduce such disregard. Cushman v. Trans Union Corp., 920 F. Supp. 80, 84 (E.D. Pa. 1996) ("It is not necessary for the plaintiff to produce a `smoking gun' or other form of definite proof.") aff'd 115 F.3d 220 (3rd Cir. 1997). "Instead, where intent has not been explicitly expressed, the trier of fact may deduce it from the surrounding circumstances." Ibid. The "surrounding circumstances" may include a defendant's awareness of the problems and failure to take any corrective action, both of which are present here. See, e.g., Coughlin v. Tailhook Assn.,112 F.3d 1052, 1057 (9th Cir. 1997) (hotel's knowledge of prior convention-related assaults and its failure to take adequate steps to prevent such occurrences supported jury's finding of "conscious disregard"); Larez v. City of Los Angeles, 946 F.2d 630, 646-47, 649 (9th Cir. 1991) (affirming award of punitive damages based on police chief's "recklessness or callous indifference" to prior complaints concerning inadequate procedures); Ingram v. Acands, Inc., 977 F.2d 1332, 1342 (9th Cir. 1992) (knowledge of health risks of asbestos and failure to provide warning constituted "wanton disregard" entitling plaintiff to punitive damages). "When willfulness is an issue, summary judgment should be granted with caution, since questions such as intent or motive are presented." Simpson v. United States, 652 F.2d 831, 834 (9th Cir. 1981) ("Whether the efforts of [defendant] were so feeble as to rise to the level of willfulness is a material issue of fact which should have prevented summary judgment and which now warrants reversal."). See also Miller, 945 F.2d at 1467.

In numerous FCRA cases, courts have consistently denied defendant's motion for summary judgment on punitive damages. Wiggins, 848 F. Supp. at 219 ("this Court cannot say that the record shows willfulness, or the absence of willfulness, as a matter of law. Rather, the Court believes that it should be left to the jury to resolve the disputed facts and decide whether those facts demonstrate a willful failure to follow reasonable procedures.") (Citing Collins v. Retail Credit Co., 410 F. Supp. 924, 931-32 (E.D. Mich. 1976).

**2. Defendant claims there is no private right of action under 15 U.S.C. § 1681s-2(a), which governs the duty of furnishers. The Plaintiff will clarify the law from the FCRA**

**§ 602. Congressional findings and statement of purpose [15 U.S.C. § 1681]**

(a) Accuracy and fairness of credit reporting. The Congress makes the following findings:

(1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

**§ 603. Definitions; rules of construction [15 U.S.C. § 1681a]**

(a) Definitions and rules of construction set forth in this section are applicable for the purposes of this title.

(b) The term "person" means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity.

(c) The term "consumer" means an individual.

**617. Civil liability for negligent noncompliance [15 U.S.C. § 1681o]**

(a) In general. Any person who is negligent in failing to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1) any actual damages sustained by the consumer as a result of the failure; and

(2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

(b) Attorney's fees. On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

**§ 623. Responsibilities of furnishers of information to consumer reporting agencies**

**[15 U.S.C. § 1681s-2]**

(a) Duty of Furnishers of Information to Provide Accurate Information

(1) Prohibition

(A) Reporting information with actual knowledge of errors. A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

(B) Reporting information after notice and confirmation of errors. A person shall not furnish information relating to a consumer to any consumer reporting agency if

(i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and

(ii) the information is, in fact, inaccurate.

(C) No address requirement. A person who clearly and conspicuously specifies to the consumer an address for notices referred to in subparagraph (B) shall not be subject to subparagraph (A); however, nothing in subparagraph (B) shall require a person to specify such an address.

(D) Definition. For purposes of subparagraph (A), the term "reasonable cause to believe that the information is inaccurate" means having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information.

(2) Duty to correct and update information. A person who

(A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

(B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

(3) Duty to provide notice of dispute. If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

**Case Law to Support private right of action under 15 U.S.C. § 1681s-2(a),**

Dornhecker  ro. Ameritech Corp., 99 F. Supp. 2d 918 (N.D. Ill. 2000).

A U.S. district court held that the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681 et seq., permits consumers to bring private causes of action against furnishers of information to credit reporting agencies who fail to properly investigate disputed credit information.

Here, a telephone services provider opened phone service accounts on behalf of third persons who fraudulently used the names of other individuals. The provider subsequently enlisted the services of collection agencies to satisfy the debts on the accounts. After being made aware of the debts, the individuals whose names had been used notified the credit reporting agencies of the fraud. After the individuals, collection agencies, and credit reporting agencies notified the provider of the dispute, the provider reportedly failed to investigate. The individuals sued the provider, alleging, among other claims, that defendant violated 1681s-2(b)(1) of the FCRA by failing to properly investigate the disputed credit information. Defendant moved to dismiss, arguing that Plaintiffs lacked standing because the FCRA does not create a private right of action for consumers.

Denying the motion, the court agreed with the U.S. Supreme Court's analysis-set forth in Cort v. Ash, 95 S. Ct. 2080 (1975) for determining whether an implied private right of action exists under a statute. The four factors are: whether (1) the plaintiff is a member of a class for whose benefit the statute was enacted; (2) the legislative history indicates congressional intent, explicit or implicit, either to create or deny such a remedy; (3) implying a private remedy would frustrate the underlying purposes of the legislative scheme; and (4) the cause of action is one traditionally relegated to state law.

May it please the Court: the Plaintiff has disputed with the Defendant and The Credit Reporting Agencies in the same time period and has attached proof to this Motion of these mailings via certified mail to both the Defendant and the credit bureaus. The question is that during the investigation did the Defendant "talk" to the Bureaus and vice versa how does anyone know without proof? Defendant claims we did an investigation this is hearsay.  No proof other than their statement. Why did the Defendant not provide this alleged investigation information to the Plaintiff after they had done their alleged investigation? Most likely if they had it may have prevented this suit.

# FCRA PROVIDES PRIVATE CAUSE OF ACTION AGAINST FURNISHER OF INFORMATION

Gordon v. Greenpoint Credit, 266 F.Supp.2d 1007 (S.D. Iowa 2003). and

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD L. SHEFFER, :

Plaintiff, : CIVIL ACTION

v. :

EXPERIAN INFORMATION :

SOLUTIONS, INC., et al., : No. 02-7407

Defendants. :

MEMORANDUM AND ORDER

SCHILLER, J. February , 2003

In its motion, Sears contends that Plaintiff's claim under the FCRA should be dismissed because consumers have no private right of action against a credit furnisher under 15 U.S.C. § 1681s-2(b). In the alternative, Sears argues that Mr. Sheffer's allegations are legally insufficient because Plaintiff has failed to allege that a credit reporting agency has sent a dispute verification form to Sears. Sears also moves for the dismissal of Mr. Sheffer's defamation claim, arguing that the claim is preempted by the FCRA.

With respect to the issue of whether § 1681s-2(b) creates a cause of action for a consumer against a furnisher of credit information, Sears correctly notes that courts have reached different conclusions. However, a clear majority of courts that have addressed this issue has "effectively recognized Congress' obvious intent [to] create a private cause of action through § 1681s-2."

Vazquez-Garcia v. Trans Union De P.R., Inc., 222 F. Supp. 2d 150, 155 (D.P.R. 2002); see also

Nelson v. Chase Manhattan Mortg. Corp., 282 F.3d 1057, 1058 (9th Cir. 2002) (describing purpose of § 1681s-2(b) as "providing some private remedy to injured consumers"). The reasoning in support of the majority view has been aptly summarized:

The civil liability sections, 15 U.S.C. § 1681n and 1681o, explicitly provide a private right of action for consumers wishing to enforce **any provision** of the Fair Credit Reporting Act against "any person" who either "willfully fails to comply" or is "negligent in failing to comply." Absent any explicit limitation, the plain

language of 15 U.S.C. §§ 1681n, 1681o, 1681s-2(b) and (c) provide a private right of action for a consumer against furnishers of information who have willfully or negligently failed to perform their duties upon notice of a dispute. Furthermore, the negative inference of explicitly precluding a consumer's right of action for violations of § 1681s-2(a) is that they are preserved in § 1681s-2(b). Accordingly, the plain language of the Fair Credit Reporting Act compels the conclusion that there is a private right of action for consumers to enforce the investigation and reporting duties imposed on furnishers of information.

### 3. Summary Judgment:

"Summary judgment is appropriate if the evidence read in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Bullock v. Gomez, 929 F. Supp. 1299, 1301-1302 (C.D. Cal. 1996), citing Fed.R.Civ.P. 56(c). In reviewing the evidence tendered in support of and in opposition to the motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor." Id. at 1302 See also Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1435 (9th Cir. 1995) (any and all inferences that a jury could reasonably draw in favor of the non-moving party must be so drawn by the Court).

For purposes of the instant motion, once plaintiff tenders sufficient evidence from which the jury could infer liability, it is for the jury to resolve the factual disputes and ultimately to "judge the adequacy of consumer reporting agency procedures." Bryant, 689 F.2d at 78 ("Each case under[15 U.S.C. § 1681e(b)] will vary on the facts, and each must be judged on its own merits" using a reasonableness standard.). See also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter"). Thus, TRW can only prevail on its motion for summary judgment by negating all possibilities that a reasonable jury could infer that it failed to comply with the FCRA provision at issue. Ibid. (in order to prevail on summary judgment, the moving party must "foreclose the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that [a violation had occurred].").

## SUMMATION

The Plaintiff has disputed with the Furnisher/Defendant and the Credit Bureaus in the same time frame.  See the certified mailings attached.

The OCC, Federal Reserve Board, FDIC, OTS, NCUA, and the FTC (Agencies) issued a joint final rule (Final Rule) under Section 312 of the Fair and Accurate Credit Transactions Act of 2003 (FACT Act), which amends the Fair Credit Reporting Act (FCRA). Section 623 of the FCRA describes the responsibilities of persons that furnish information about consumers (furnishers) to credit reporting agencies (CRAs). The Final Rule addresses the accuracy and integrity of reported information and furnishers' responsibility to reinvestigate disputes based on direct disputes from consumers. Furnishers are also required to establish policies and procedures to implement the requirements.

**Policies and Procedures**

The Final Rule requires furnishers to establish and implement reasonable written policies and procedures regarding the accuracy and integrity of information about consumers furnished to a CRA. The policies and procedures must be appropriate to the nature, size, complexity, and scope of the furnisher's activities.

Furnishers must consider the accuracy and integrity guidelines (in the Appendix of each Agency's regulation) in developing policies and procedures. Furnishers must also review them periodically and update them as necessary, but an audit requirement is not imposed. Not all of the guidelines must be implemented.

According to the guidelines, furnishers' policies and procedures should identify areas that compromise the accuracy or integrity of reported information, evaluate the effectiveness of existing policies and procedures, consider the need for changes, and evaluate the effectiveness of how information is provided to CRAs, making changes as necessary.

The elements of a furnisher's policies and procedures should include how consumer information is reported, maintaining records [1], maintaining internal controls, training, oversight, furnishing consumer information in connection with mergers and other transactions, data integrity, dispute resolution, controls related to consumer reports furnished to CRAs, conducting periodic evaluations of procedures, and complying with applicable laws and regulations.

**Key Definitions**

Accuracy. The term "accuracy" is defined as information that a furnisher provides to a CRA about an account or other relationship with the consumer that correctly:

- reflects the terms of and liability for the account or other relationship;
- reflects the consumer's performance and other conduct with respect to the account or other relationship; and
- identifies the appropriate consumer.

The term "without error" was proposed but not included in the Final Rule because it would imply such high standards that the Agencies feared it might lead some persons to limit furnishing information to CRAs. The adopted "correctly reflects" standard is intended to achieve a high degree of accuracy without creating litigation risks.

Integrity. Information furnished to a CRA may be technically accurate yet lack "integrity" because it presents a misleading picture of the consumer's creditworthiness if critical information is omitted. The term "integrity" is defined as information that a furnisher provides to a CRA about an account or other relationship with the consumer that:

- is substantiated by the furnisher's records at the time it is furnished;
- is furnished in a form and manner that is designed to minimize the likelihood that the information may be incorrectly reflected in a consumer report; and
- includes the information in the furnisher's possession about the account or other relationship that the relevant Agency has:
- determined that the absence of which would likely be materially misleading in evaluating a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living; and
- listed in section I.(b)(2)(iii) of the guidelines. (This section provides one item on this list: the credit limit, if applicable and in the furnisher's possession) [2].

Each Agency will determine, and list in its guidelines, the types of information in a furnisher's possession that must be provided to promote the integrity of the information. This list will be based on the Agency's determination that the absence of the information would likely be materially misleading. In the preamble to the Final Rule, the Agencies note that, as furnishing information under the FCRA is voluntary, the definition of integrity applies only to information that the furnisher elects to provide to a CRA. The phrase "standardized and clearly understandable form" was proposed but not included in the Final Rule, but this notion is included in the guidelines.

Furnisher. The term "furnisher" means an entity that furnishes information relating to consumers to one or more CRAs for inclusion in a consumer report. An entity is not a furnisher when it:

- provides information to a CRA solely to obtain a consumer report;
- is acting as a CRA (e.g., resellers);
- is a consumer to whom the furnished information pertains (i.e., through self-reporting); or
- is a neighbor, friend, or associate of the consumer, or another individual with whom the consumer is acquainted or who may have knowledge about the consumer, and who provides information about the consumer's character, general reputation, personal characteristics, or mode of living in response to a specific request from a CRA. The last exception parallels the types of information that are collected in connection with an investigative consumer report, and is deemed necessary to avoid disrupting those activities.

**Direct Dispute/Investigation**

A furnisher is now required to conduct a reasonable investigation if a consumer directly disputes certain information contained in a consumer report. "Direct dispute" means a dispute submitted directly to a furnisher (including a furnisher that is a debt collector) by a consumer concerning the accuracy of any information contained in a consumer report and pertaining to an account or other relationship that the furnisher has or had with the consumer. A furnisher is required to conduct a reasonable investigation if the dispute relates to:

- the consumer's liability for a credit account or other debt with the furnisher, such as direct disputes relating to whether there is or has been identity theft or fraud against the consumer, whether there is individual or joint liability on an account, or whether the consumer is an authorized user of a credit account;
- the terms of a credit account or other debt with the furnisher, such as direct disputes relating to the type of account, principal balance, scheduled payment amount on an account, or the amount of the credit limit on an open-end account;
- the consumer's performance or other conduct concerning an account or other relationship with the furnisher, such as direct disputes relating to the current payment status, high balance, date a payment was made, the amount of a payment made, or the date an account was opened or closed; or
- any other information contained in a consumer report regarding an account or other relationship with the furnisher that bears on the consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

These provisions do not apply to a furnisher if the direct dispute relates to:

- the consumer's identifying information (other than a direct dispute relating to a consumer's liability for a credit account or other debt with the furnisher) such as name, date of birth, SSN, telephone number, or address;

- the identity of past or present employers;

- inquiries or requests for a consumer report;

- information derived from public records, such as judgments, bankruptcies, liens, and other legal matters (unless provided by a furnisher with an account or other relationship with the consumer);

- information related to fraud alerts or active duty alerts; or

- information provided to a consumer reporting agency by another furnisher; or

- the furnisher has a reasonable belief that the direct dispute is submitted by, is prepared on behalf of the consumer by, or is submitted on a form supplied to the consumer by, a credit repair organization [3].

Under any of these circumstances, the furnisher is not required to investigate the dispute (and these circumstances render the dispute "frivolous or irrelevant" as discussed below).

The consumer is required to submit a dispute notice to the furnisher: (i) at the furnisher's address indicated by the furnisher on the consumer report; (ii) at a location clearly and conspicuously specified by the furnisher for submitting direct disputes provided in writing or electronically (if the consumer has agreed to the electronic delivery of information from the furnisher); or (if not provided as indicated above) at any business address of the furnisher.

The dispute notice must include sufficient information to identify the account or other relationship, the specific information in dispute together with an explanation, and all supporting documentation or other information reasonably required to substantiate the dispute. This may include a copy of the disputed portion of the consumer report, a police report, affidavit, court order; or account statements.

After receiving the notice, the furnisher must conduct a reasonable investigation and review the relevant information provided. The investigation must be completed and reported to the consumer within the same period that a CRA is subject to under its reinvestigation duty (30 days with a possible extra 15 days) [4]. If the investigation results in a finding that the information reported was inaccurate, the furnisher must promptly notify each CRA to which the furnisher provided the information and provide any correction necessary to make the information accurate.

A furnisher is not required to investigate a direct dispute if the furnisher has reasonably determined that the dispute is "frivolous or irrelevant." This exception applies if the consumer did not provide sufficient information to investigate the disputed information, or the furnisher had previously handled the same dispute properly. (A direct dispute is not substantially the same if it includes new information not included in the earlier dispute). These examples are not intended to be exhaustive.

The furnisher must notify the consumer within five business days after making a determination that a dispute is frivolous or irrelevant by mail or (if authorized by the consumer for that purpose) by any other means available to the furnisher. The notice must include the reasons for the determination and identify any information required to investigate the disputed information. It is allowable that the notice consist of a standardized form describing the general nature of such information. The Agencies note that the FTC, when it next updates its General Summary of Consumer Rights, will include consumers' direct dispute rights in the summary.

Guidelines

Each of the Agencies provides an Appendix to its respective Final Rule entitled, "Interagency Guidelines Concerning The Accuracy And Integrity Of Information Furnished To Consumer Reporting Agencies." The guidelines include more detailed procedures and guidance on all aspects of the obligations in the Final Rule. In the preamble to the Final Rule, the Agencies disclaim a "one-size-fits-all" approach requiring all furnishers to implement all of the guidelines. As discussed, a furnisher's policies and procedures should be appropriate to the nature, size, complexity, and scope of its activities.

It appears that the Final Rule will become effective on July 1, 2010.

1.      No specific retention period is prescribed in the Final Rule or guidelines. Records must be kept for "a reasonable period of time, not less than any applicable recordkeeping requirement, in order to substantiate the accuracy of any information about consumers it furnishes that is subject to a direct dispute. Guidelines Section III.c.

2.      The Agencies consider that a key factor for evaluating creditworthiness is credit utilization. Omission of a credit limit for an account results in credit evaluators either ignoring credit utilization or using a substitute measure for the credit limit, such as the highest balance, which may result in a higher estimate of credit utilization.

3.      The term is defined in 15 U.S.C. 1679a(3) as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for

the payment of money or other valuable consideration, for the express or implied purpose of—(i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)." For purposes of the Final Rule, the term also includes 501c-3 organizations that are credit repair organizations.

4.      The actual period is the limit set forth in 15 U.S.C. 1681i(a)(1) applicable to a consumer reporting agency's reinvestigation duty—that is, 30 days with a limited 15-day extension.

The Plaintiff moves this honorable court to Dismiss the Defendant's Motion for Summary Judgment and set these proceedings for a date to hear arguments in regards to both Motions for Summary Judgment which are before this court.  Plaintiff also wishes to preserve his right for a motion to compel the Defendant once the amended discovery requests are answered.


Timothy Harris
4005 Cherokee Rose Ave.
North Las Vegas, NV 89031
702-371-3658
Extremeps1@cox.net

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the forgoing Response to Defendants Motion for Summary Judgment/ Reply to Defendant's response to Plaintiffs Motion for Summary Judgment Harris vs. Wells Fargo Auto Finance, LLC, Defendants has been served at their attorney of record at Snell & Wilmer L.L.P., 3883 Howard Hughes Parkway, Suite 1100, Las Vegas, Nevada 89169 on or about the 28th day of September, 2011 by both email and U.S. Postal Service.  This will also serve as notice for all PACER / ECF participants.

Timothy Harris
4005 Cherokee Rose Ave.
North Las Vegas, NV 89031
702-371-3658
Extremeps1@cox.net

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X JAAFAR ALBAZONY     ☐ Agent     ☐ Addressee

B. Received by ( Printed Name)   JUN 2 3 2010   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

Wells Fargo Auto Finance
Attn: Credit Dispute Resolution
P.O. Box 29704
Phoenix, AZ 85038

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)     7009 3410 0001 0346 7865

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL   RECEIPT**
*(Domestic Mail Only. No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

PHOENIX AZ 85038

| | |
|---|---|
| Postage | $ $0.44 | 0094 |
| Certified Fee | $2.80 | 11 |
| Return Receipt Fee (Endorsement Required) | $2.30 | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.54 | 06/17/2010 |

Sent To
Wells Fargo Auto Finance
Street, Apt. No.;
or PO Box No. Attn: Credit Dispute Resolution
City, State, ZIP+4
P.O.B. 29704   Phoenix, AZ 85038

7009 3410 0001 0346 7865

**PE-TAWF-001**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Equifax
P.O. Box 740241
Atlanta, GA 30374

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
JUN 24 2010

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7009 3410 0001 0346 8084

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE
ATLANTA GA 30374

| | | |
|---|---|---|
| Postage | $ $0.44 | 0094 |
| Certified Fee | $2.80 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.54 | 06/21/2010 |

Sent To
Equifax - WF
Street, Apt. No.; or PO Box No.
P.O. Box 740241
City, State, ZIP+4
Atlanta, GA 30374

7009 3410 0001 0346 8084

---

# PE-THWF-002

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
                              ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
701 EXPERIAN PARKWAY

1. Article Addressed to:

Experian
P. O. Box 2002
Allen, TX 75013

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

JUN 23 2010

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
   (Transfer from service label)     7009 3410 0001 0346 8077

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL   RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.44 | 0094 |
| Certified Fee | $2.80 | 09  Postmark Here |
| Return Receipt Fee (Endorsement Required) | $2.30 | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ | $5.54 | 06/21/2010 |

Sent To  Experian - WF

Street, Apt. No.; or PO Box No.  P. O. Box 2002

City, State, ZIP+4  Allen, TX 75013

7009 3410 0001 0346 8077

PS Form 3800, August 2006          See Reverse for Instructions

PE·THWF·003

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Trans Union
P. o. Box 1000
Chester, PA 19022

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ☐ Agent
   ☐ Addressee

B. Received by TransUnion LLC   ☐ Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7009 3410 0001 0346 8046

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL   RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com.

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.44 | 0094 |
| Certified Fee | $2.80 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ | $5.54 | 06/21/2010 |

Sent To
Trans Union - WF
Street, Apt. No.; or PO Box No.
P. o. Box 1000
City, State, ZIP+4
Chester, PA 19022

7009 3410 0001 0346 8046

---

PE-THWF-004



| | Limit: | | | |
| | Past Due: | | | |
| | Payment Status: | | | |
| | Comments: | | | |

**24- Month Payment History**

| Date: | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 09 | 09 | 09 | 09 | 09 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Experian: | | | | | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| Equifax: | | | | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| TransUnion: | | | | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | DK | OK | OK | OK | OK | OK | OK | OK |

**BANK OF AMERICA, N.A.**

| | Experian | Equifax | TransUnion |
|---|---|---|---|
| Account Name: | | | |
| Account Number: | | | |
| Account Type: | | | |
| Account Status: | | | |
| Monthly Payment: | | | |
| Date Opened: | | | |
| Balance: | | | |
| Terms: | | | |
| High Balance: | | | |
| Limit: | | | |
| Past Due: | | | |
| Payment Status: | | | |
| Comments: | | | |

**24- Month Payment History**

| Date: | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 08 | 08 | 08 | 08 | 08 | 08 | 08 | 08 | 08 | 08 | 08 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 10 |
| Experian: | | | | | | | | | | | | | | | | | | | | | OK | ND | OK | OK |
| Equifax: | | | | | | | | | | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| TransUnion: | | | | | | | | | | | | | | | | | | | | | OK | ND | OK | OK |

**WELLS FARGO**

| | Experian | Equifax | TransUnion |
|---|---|---|---|
| Account Name: | WELLS FARGO | WELLSFAFI | WELLS FARGO |
| Account Number: | 5023150219148XXXX | 5023150219148XXXX | 5023150219148XXXX |
| Account Type: | Installment | Installment | Installment |
| Account Status: | Open | Open | Open |
| Monthly Payment: | $262 | $262 | $262 |
| Date Opened: | 09/2008 | 09/2008 | 09/2008 |
| Balance: | $7,937 | $7,937 | $7,937 |
| Terms: | 60 | | 60 |
| High Balance: | $10,308 | $10,308 | $10,308 |

PE·THWF·009    Page 1

| | | | |
|---|---|---|---|
| Limit: | - | - | - |
| Past Due: | $1,310 | $1,310 | $1,310 |
| Payment Status: | 90 Days Late | 90 Days Late | 90 Days Late |
| Comments: | Account in dispute - reported by subscriber (FCBA) Account information disputed by customer | | Auto Account information disputed by consumer |

**24- Month Payment History**

| Date: | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 09 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 |
| Experian: | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | ND | ND | ND | ND | ND | ND | ND | ND | ND | 90 |
| Equifax: | | | | | | | | | | | | | | | | | | | | | | | | |
| TransUnion: | | | | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | 90 |

| | Experian | Equifax | TransUnion |
|---|---|---|---|
| Account Name: | | | |
| Account Number: | | | |
| Account Type: | | | |
| Account Status: | | | |
| Monthly Payment: | | | |
| Date Opened: | | | |
| Balance: | | | |
| Terms: | | | |
| High Balance: | | | |
| Limit: | | | |
| Past Due: | | | |
| Payment Status: | | | |
| Comments: | | | |

**24- Month Payment History**

| Date: | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 09 | 09 | 09 | 09 | 09 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Experian: | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| Equifax: | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| TransUnion: | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | Experian | Equifax | TransUnion |
|---|---|---|---|
| Account Name: | | | |
| Account Number: | | | |
| Account Type: | | | |
| Account Status: | | | |
| Monthly Payment: | | | |
| Date Opened: | | | |
| Balance: | | | |
| Terms: | | | |
| High Balance: | | | |

*PE-THWF-009*    *Page 2*

   

## Account History

Below is information on any accounts you may have opened in the past. Accounts that are paid as agreed can remain on your report for up to 10 years from the date of last activity. Typically, a consumer reporting agency will not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.

**WELLS FARGO**

| | Experian | Equifax | TransUnion |
|---|---|---|---|
| Account Name: | WELLS FARGO | WELLSFAFI | WELLS FARGO |
| Account Number: | 5023150219148XXXX | 5023150219148XXXX | 5023150219148XXXX |
| Account Type: | Installment | Installment | Installment |
| Account Status: | Open | UnPaid | UnPaid |
| Monthly Payment: | - | $262 | $262 |
| Date Opened: | 09/2008 | 09/2008 | 09/2008 |
| Balance: | $8,499 | $8,499 | $8,499 |
| Terms: | 60 | | 60 |
| High Balance: | $10,308 | $8,499 | $10,308 |
| Limit: | - | - | - |
| Past Due: | - | $0 | $0 |
| Payment Status: | 150 Days Late | Chargeoff or Collection | Chargeoff or Collection |
| Comments: | Account in dispute - reported by subscriber (FCBA) Account information disputed by customer | | Auto Account information disputed by consumer |

**24- Month Payment History**

| Date: | Sep 09 | Oct 09 | Nov 09 | Dec 09 | Jan 10 | Feb 10 | Mar 10 | Apr 10 | May 10 | Jun 10 | Jul 10 | Aug 10 | Sep 10 | Oct 10 | Nov 10 | Dec 10 | Jan 11 | Feb 11 | Mar 11 | Apr 11 | May 11 | Jun 11 | Jul 11 | Aug 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Experian: | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | 30 | 60 | 90 | 120 | 150 | 180 | 180 | 180 | CO | CO |
| Equifax: | | | | | | | | | | | | | | | | | | | | | | | | |
| TransUnion: | | | | | | | | | | | | | | | | | | | | | | | | |



| | Experian | Equifax | TransUnion |
|---|---|---|---|

  

PE-THWF-014

9/13/2011 3:22 PM

1  Cynthia L. Alexander, Esq.
   Nevada Bar No. 006718
2  Jennifer R. Hargis, Esq.
   Nevada Bar No. 11392
3  SNELL & WILMER L.L.P.
   3883 Howard Hughes Parkway
4  Suite 1100
   Las Vegas, NV 89169
5  Telephone (702) 784-5200
   Email: calexander@swlaw.com
6         jhargis@swlaw.com

7  *Attorneys for Defendant Wells Fargo Financial Nevada, Inc.,*
   *sued here as Wells Fargo Auto Finance, LLC*

8

9                    IN THE UNITED STATES DISTRICT COURT

10                          DISTRICT OF NEVADA

11

12  TIMOTHY P. HARRIS, Pro Se,              CASE NO. 2:11-cv-00388-JMC-PAL

13                  Plaintiff,
                                            **OPPOSITION TO PLAINTIFF'S**
14  vs.                                     **MOTION FOR SUMMARY JUDGMENT**

15  WELLS FARGO AUTO FINANCE, LLC,          **AND**

16                  Defendant.              **WELLS FARGO'S MOTION FOR**
                                            **SUMMARY JUDGMENT**
17

18          Defendant Wells Fargo Financial Nevada, Inc. sued here as Wells Fargo Auto Finance,

19  LLC ("Wells Fargo"), by and through the law firm of Snell & Wilmer, L.L.P., hereby opposes

20  Plaintiff's Motion for Summary Judgment and also moves this court to enter summary judgment

21  in Wells Fargo's favor pursuant to Fed. R. Civ. P. 56.

22          Wells Fargo's Motion for Summary Judgment is based on the memorandum of points and

23  ///

24  ///

25  ///

26  ///

27

28

    13707530.1

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

PE-TNUF-015

1   authorities herein, the pleadings on file with this Court, the exhibits attached hereto, and any oral

2   argument this Court may entertain.

3       Dated September 12, 2011.

4

5                     SNELL & WILMER L.L.P.

6           By: _____

7               Cynthia L. Alexander, Esq.
            Jennifer R. Hargis, Esq.

8               3883 Howard Hughes Parkway
            Suite 1100

9               Las Vegas, Nevada 89169

10              *Attorneys for Defendant Wells Fargo Financial*
            *Nevada, Inc., sued here as Wells Fargo Auto*

11              *Finance, LLC*

12

13          **MEMORANDUM OF POINTS AND AUTHORITIES**

14                  **I.    INTRODUCTION**

15      Plaintiff alleges Wells Fargo violated the Fair Credit Reporting Act, 15. U.S.C. § 1681

16  *et seq.* ("FCRA") by failing to "mark[] 2 of the Plaintiffs 3 credit reports in dispute." and by

17  failing "to do the required investigation" (Plaintiff's Motion, p. 2, ll. 47-48, p. 4, ll. 83).

18  Plaintiff's claims fail as a matter of law.  First, the FCRA does not provide a private right of

19  action against a furnisher of information such as Wells Fargo for failure to report a consumer's

20  dispute.   Moreover, there is no evidence that Wells Fargo failed to conduct a reasonable

21  investigation as required by the FCRA, or that there was any actual inaccuracy in Wells Fargo's

22  reporting that an investigation should have uncovered.  Plaintiff's claims fail on these grounds

23  alone.  In addition, however, Plaintiff has not, and could not, be damaged by any alleged failure

24  to investigate, because there was no inaccuracy in Plaintiff's consumer credit reports.

25      Because Plaintiff's claims fail as a matter of law, his Motion for Summary Judgment

26  should be denied, and Wells Fargo's Motion for Summary Judgment should be granted.

27          **II. STATEMENT OF UNDISPUTED MATERIAL FACTS**

28      On or about September 10, 2008, Plaintiff executed a Note and Security Agreement

13707530.1

- 2 -

1   ("Agreement") in which he borrowed a total of $10,308.00 from Wells Fargo in order to

2   purchase a 2005 Pontiac Aztec, which loan was secured by the vehicle. **Exhibit 1**, Agreement.

3   Plaintiff timely made payments on the loan until March 2011.

4        On or about June 17, 2010, Plaintiff sent a letter to Wells Fargo disputing the account,

5   which stated that he discovered Wells Fargo was reporting "derogatory information" on his

6   credit reports, and that he was disputing the balance on the account. **Exhibit 2**, Dispute Letter,

7   and Affidavit of C. Martin, ¶ 5.  On or about June 21, 2010, Wells Fargo received an

8   Automated Consumer Dispute Verification ("ACDV") request with respect to Plaintiff's

9   account, via the e-Oscar system. Affidavit of C. Martin, ¶ 6. E-Oscar is a web-based, Metro 2

10   compliant, automated system that enables data furnishers and the four major CRAs to create

11   and respond to consumer credit history disputes.  *Id.*  The ACDV process is an automated

12   process that enables the CRAs to initiate a request to verify, update or delete information

13   contained in a consumer credit report.  *Id.*  The ACDV request as to Plaintiff's account stated

14   only that the account was disputed by the consumer, and requested that Wells Fargo verify the

15   Plaintiff's account status, payment history profile, and payment rating.  *Id.*, ¶ 7.  At the time,

16   Wells Fargo's reporting to Consumer Reporting Agencies ("CRA") indicated that Plaintiff's

17   account was current. *Id.* See also ACDV Report, **Exhibit 3**.

18        On June 22, 2010, the next day, Wells Fargo investigated Plaintiff's account status,

19   payment history profile, and payment rating.  Affidavit of C. Martin, ¶ 8.  Wells Fargo

20   determined that the account was paid current, with a balance of $7461.00.  *Id.*  That same day,

21   Wells Fargo sent a letter to Plaintiff, informing him that it would add a note to its reporting

22   with the CRAs indicating that the account was disputed. Affidavit of C. Martin, ¶ 9, **Exhibit 4**,

23   Letter to Plaintiff.  Also on June 22, Wells Fargo sent an Automated Universal Data ("AUD")

24   record through the e-Oscar system, which updates a consumer's credit information though all

25   four CRAs, to reflect that Plaintiff disputed the account.  Affidavit of C. Martin, ¶ 10, AUD

26   Report, **Exhibit 5**.  Wells Fargo sent a response to the ACDV request on June 29, 2010,

27   instructing the CRAs to modify their reporting to indicate that the account was disputed by the

28   consumer.  Affidavit of C. Martin, ¶ 11, ACDV Report, Exhibit 3. Wells Fargo closed its filed

13707530.1

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    on the dispute that day, and Wells Fargo has not received any further notice of dispute from any

2    CRA with respect to Plaintiff's account. Affidavit of C. Martin, ¶ 11.

3        According to the pages from credit reports attached to Plaintiff's Motion, as of August

4    25, 2010, Experian reported that Plaintiff's account was disputed by the consumer.  As of

5    November 17, 2010, both Experian and Trans Union reported the account as disputed by the

6    consumer.  Plaintiff stopped making payments on the loan beginning with the payment due in

7    March 2011, and there is currently an outstanding amount owed of approximately $7938.00.

8    Affidavit of C. Martin, ¶ 12.  Thus, by May 3, 2011, the account was reported as late by all

9    three CRAs, and the account was noted as disputed by Experian and Trans Union.

10       Also in March 2011, Plaintiff filed the instant suit, alleging that Wells Fargo violated

11   the FCRA by allegedly failing to mark his account as disputed and failing to investigate the

12   dispute.

## III.    LEGAL ARGUMENT

### A. Legal Standard

15       Summary judgment is appropriate "if pleadings, the discovery and disclosure material on

16   file, and any affidavits show that there is no genuine issue as to any material fact and that the

17   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is

18   not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441

19   (9th Cir. 1995).

20       The moving party has the burden of establishing the absence of a genuine issue of

21   material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

22   (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving

23   party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at

24   324, 106 S.Ct. 2548. A nonmoving party cannot defeat summary judgment by relying on the

25   allegations in the complaint, or with unsupported conjecture or conclusory statements.

26   *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Thus, summary

27   judgment should be entered against "a party who fails to make a showing  sufficient to establish

28   the existence of an element essential to that party's case, and on which that party will bear the

13707530.1

- 4 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

2       The nonmoving party must set forth "specific facts showing a genuine issue for trial."

3   Fed. R. Civ. P. 56(e). The "mere existence of a scintilla of evidence in support of plaintiff's

4   position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91

5   L.Ed.2d 202 (1986). Therefore, where "the record taken as a whole could not lead a rational trier

6   of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec.*

7   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

8   (1986) (internal quotation marks omitted).

9       **B. There is no private right of action against Wells Fargo for any inaccuracies in**

10   **Plaintiff's credit report.**

11       Plaintiff is not entitled to summary judgment, and Wells Fargo is entitled to summary

12   judgment as a matter of law, because there is no private right of action against furnishers of

13   information such as Wells Fargo for failing to report information accurately.  Plaintiff's

14   Complaint, and his Motion for Summary Judgment, allege that Plaintiff is entitled to damages

15   because Wells Fargo failed to "mark" Plaintiff's consumer credit reports to show that Plaintiff

16   disputed the information regarding his Wells Fargo auto loan.  There is no private right of

17   action with respect to this claim.

18       Plaintiff asserts Wells Fargo violated 15 U.S.C. § 1681s-2.  Although Plaintiff does not

19   state in his Motion which subsection he claims Wells Fargo violated, it appears that Plaintiff is

20   alleging that Wells Fargo violated 1681s-2(a), which sets forth various requirements for

21   furnishers of information to provide accurate information to CRAs.  Pursuant to this section,

22   Wells Fargo must provide accurate information; update information if it is discovered to be

23   inaccurate; and report information as disputed when a consumer disputes it.  See 15 U.S.C. §

24   1681s-2(a)(1), (2), and (3) (2011).  Specifically, it appears that Plaintiff's complaints arise

25   under 1681s-2(a)(3), which requires furnishers of information to report to the CRAs that the

26   information is disputed by the consumer.

27       However, any breach of these duties does not give rise to a private right of action.

28   Pursuant to 15 U.S.C. § 1681s-2(c), the statutory provisions allowing for private enforcement

13707530.1

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    by consumers (15 U.S.C. § 1681n and § 1681o) do not apply to any violation of 15 U.S.C.

2    1681s-2(a).   15 U.S.C. § 1681s-2(c).   The Ninth Circuit has also held that there is no private

3    right of action for any alleged violation of 15 U.S.C. 1681s-2(a).   *Gorman v. Wolpoff &*

4    *Abramson, LLP,* 584 F.3d 1147 (9th Cir. 2009). Only federal or state officials, and not private

5    citizens, can pursue an alleged violation of the provisions of 15 U.S.C. 1681s-2(a).   *Gorman,*

6    584 F.3d 1147.

7          Therefore, Plaintiff's claim that Wells Fargo violated 15 U.S.C. § 1681s-2(a) by failing

8    to mark his account in dispute must fail because there is no private right of action providing

9    any remedy to him for any alleged violation of this section of the statute.   Plaintiff is not

10   entitled to summary judgment as to this claim, and Wells Fargo is entitled to summary

11   judgment in its favor.

12          **C.  Wells Fargo is entitled to judgment as a matter of law with respect to any claim**

13   **pursuant to Section 1681s-2(b).**

14          Although there is no private right of action for a violation of §1681s-2(a), the Ninth

15   Circuit has recognized that there is a private right of action for violation of § 1681s-2(b) of the

16   FCRA.   *Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057 (9th Cir. 2002).   Again,

17   although the Plaintiff has not indicated which specific section of 1681s-2 he claims Wells

18   Fargo violated, Plaintiff has alleged in his Complaint and in his Motion that Wells Fargo failed

19   to investigate when Plaintiff disputed his account, which implies an alleged violation of §

20   1681s-2(b).

21          Under the FCRA, consumers generally notify CRAs of disputes regarding the accuracy

22   of reports provided by the CRAs. See 15 U.S.C. § 1681i(a)(1). Although a consumer may

23   dispute credit information directly to a furnisher, as Plaintiff has done, the consumer has no

24   private right of action if the furnisher does not reasonably investigate the consumer's claim after

25   direct notification, rather than a dispute through a CRA. *Chiang v. Verizon New England, Inc.,*

26   595 F.3d 26 (1st Cir. 2010).   Here, although Plaintiff has not provided this Court with any

27   evidence that Wells Fargo received notice of the dispute from a CRA, Wells Fargo's records

28   indicate that it did receive an inquiry electronically from the CRAs via an ACDV request.

13707530.1

- 6 -

1    Once a furnisher has received notice of a dispute from a CRA with respect to the

2    completeness or accuracy of any information provided by it to by a CRA, it must: (a) conduct

3    an investigation of the disputed information and review all relevant information provided by

4    the CRA; (c) report the results of the investigation to the CRA; (d) if the information is

5    incomplete or inaccurate, report these results to all other CRAs and promptly modify, delete, or

6    permanently block the information.  15 U.S.C. § 1681s-2(b).  The reasonableness of the

7    investigation is to be determined by an objective standard.  See *Gorman*, 584 F.3d at 1156-57;

8    *Chiang*, 595 F.3d at 37.  The burden of showing the investigation was unreasonable is on the

9    plaintiff. *Chiang*, 595 F.3d at 37.  Moreover, if a plaintiff fails to show any actual inaccuracy in

10   the report, the claim fails as a matter of law.  *Id.*  Thus, if a plaintiff fails to demonstrate a

11   genuine issue of material fact as to whether an investigation was reasonable, OR fails to show

12   any actual inaccuracies in the reporting, his claim under 15 U.S.C. § 1681s-2(b) fails as a

13   matter of law. *Id.*

14   **1. Wells Fargo's investigation was reasonable.**

15   Whether a defendant's investigation is reasonable is a factual question normally

16   reserved for trial; however, summary judgment is proper if the reasonableness of the

17   defendant's procedures is beyond question. *Westra v. Credit Control of Pinellas*, 409 F.3d 825,

18   827 (7th Cir. 2005).  Here, Plaintiff has presented no evidence at all that Wells Fargo's

19   investigation was unreasonable, but has only alleged that Wells Fargo failed to investigate.

20   There is no dispute of material fact that Wells Fargo did in fact investigate, and that its

21   investigation was reasonable.

22   The reasonableness of an investigation depends on the information the furnisher

23   received from the CRA, and whether, based on that information, reasonable steps were taken to

24   investigate.  See, for example, *Westra*, 409 F.3d at 827; *Chiang*, 595 F.3d at 40.  The Ninth

25   Circuit and other circuit courts have found that when scant information is provide with respect

26   to the dispute, and the furnisher of information investigates based on the information provided,

27   the investigation is reasonable.  See, for example, *Gorman*, 584 F.3d 1147 (9th Cir. 2008),

28   *Chiang*, 595 F.3d 26 (1st Cir. 2010), and *Westra*, 409 F.3d 825 (7th Cir. 2005). Here, Wells

13707530.1

- 7 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   Fargo received an ACDV request on or about June 21, 2010 indicating that Plaintiff was

2   disputing the account information.  Wells Fargo was requested to verify the account status,

3   payment history, and payment rating.  Wells Fargo received no other information through the

4   ACDV to indicate the nature of Plaintiff's dispute with the information being reported about his

5   auto loan account, and in fact to this day, Plaintiff has not identified any inaccuracy in the

6   information being reported.  At the time, Plaintiff's account was being reported to the CRAs

7   (and by the CRAs) as paid current, with no late payments.

8       Wells Fargo investigated the account status, payment history, account balance, and

9   payment rating that was being reported to the CRAs.  On June 22, 2010, Wells Fargo:  1) sent a

10  letter to Plaintiff indicating that it would update its reporting with the CRAs to indicate Plaintiff

11  disputed the account; and 2) prepared an AUD indicating Plaintiff disputed the account status,

12  and distributed it through an automated system to all four CRAs.  Given the scant information

13  provided by the CRA as to the nature of Plaintiff's dispute, and the Plaintiff's refusal to provide

14  more information about the nature of his dispute, Wells Fargo was reasonable as a matter of

15  law.

16      Plaintiff's only complaint is that apparently one of the CRAs has failed to report the

17  information provided to it by Wells Fargo: that Plaintiff's account was disputed by Plaintiff.  If

18  Wells Fargo had refused to report that Plaintiff disputed the account, it could give rise to a

19  claim under 15 U.S.C. 1681s-2(b), as set forth in the Gorman case.  In that case, the creditor

20  and furnisher failed to note that the account was disputed by the consumer, and the Ninth

21  Circuit held that Plaintiff's claim under 1681s-2(b) survived summary judgment.  *Gorman*, 584

22  F.3d at 1162-1163.  In contrast, in the instant case, the undisputed evidence shows that Wells

23  Fargo updated its reporting to the CRAs, both through an AUD report and an ACDV response,

24  that Plaintiff's account was disputed.  Any failure on the part of the CRAs to report the dispute

25  does not fall on Wells Fargo's shoulders.  Plaintiff has not alleged any facts that would show

26  that Wells Fargo failed to conduct a reasonable investigation, or that it failed to report the

27  results of its investigation to the CRAs.  There is no genuine issue of material fact that Wells

28  Fargo did conduct a reasonable investigation, and that Wells Fargo is entitled to judgment in its

13707530.1

1   favor, but Plaintiff is not.

2       **2.   Plaintiff has not identified any inaccuracy that Wells Fargo's investigation**

3   **would have uncovered.**

4       In order to survive summary judgment, Plaintiff must show that a reasonable

5   investigation would have uncovered some inaccuracy in the information Wells Fargo provided

6   to the CRAs with respect to Plaintiff's account. *See Chiang*, 595 F.3d at 37; *see also Donovan*

7   *v. Bank of America*, 574 F.Supp.2d 192, 206 (D. Me. 2008). In order to carry his burden,

8   Plaintiff must show that there is some causal link between Wells Fargo's alleged failure to

9   reasonably investigate, and the inaccurate information that a reasonable investigation would

10  have revealed. *Chiang*, 595 F.3d at 37-38. "It is difficult to see how a plaintiff could prevail on

11  a claim for damages based on an unreasonable investigation of disputed data without a showing

12  that the disputed information was, in fact, inaccurate. *Id.* (internal alterations and citations

13  omitted).

14      Plaintiff has made no such showing, and in fact has not even alleged that Wells Fargo

15  reported any inaccurate information about his account. Without any showing that there was in

16  fact any inaccurate information being reported, Plaintiff's claim fails as a matter of law.

17  Plaintiff's only complaint is that one of the consumer reporting agencies failed to report the

18  account as disputed, after Wells Fargo provided information to the CRAs that Plaintiff disputed

19  information about the account. Because Plaintiff has not identified any actually inaccurate

20  information reported by Wells Fargo that a reasonable investigation would have revealed, his

21  claim fails as a matter of law.

22      Plaintiff has failed to demonstrate even a scintilla of evidence that could show Wells

23  Fargo failed to reasonably investigate his dispute, or that there was any inaccurate information

24  that Wells Fargo should have discovered upon investigation. Wells Fargo investigated

25  Plaintiff's vague dispute by verifying his account status, his payment history, and his payment

26  rating. Wells Fargo reported to the CRAs that the account was disputed by the consumer. As a

27  matter of law, Wells Fargo complied with 15. U.S.C. § 1681s-2(b), and is entitled to summary

28  judgment in its favor.

13707530.1

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

**D.  Plaintiff has no damages.**

Plaintiff must show that he is entitled to damages under the FCRA.  The FCRA provides for three types of damages, depending on whether the violation was willful or negligent – actual, statutory, and punitive.  If Plaintiff could prove a willful violation, he would be entitled to either actual damages or statutory damages, and he may be entitled to punitive damages at the court's discretion.  15 U.S.C. § 1681n.  If Plaintiff could provide negligent violation, he is only entitled to actual damages.  15 U.S.C. § 1681o.  However, Plaintiff must show actual damages in order to recover under either statute.  *Johnson v. Wells Fargo Home Mortgage*, 558 F. Supp. 1114, 1121-1122 (D. Nev. 2008).

Plaintiff has not provided one single fact that would show that he suffered any actual damages due to any alleged failure on the part of Wells Fargo to investigate.  Plaintiff has alleged, without any factual or evidentiary support, that Wells Fargo has harmed Plaintiff's credit score.  However, Plaintiff has not alleged any actual damages as a result, such as inability to obtain credit, or increased cost of credit.  Even if Plaintiff had provided any evidence of such, however, his failure to show that a reasonable investigation would have changed the outcome of Wells Fargo's investigation breaks any causal link between Wells Fargo's investigation and any damages Plaintiff could claim he suffered.  See *Donovan*, 574 F. Supp. 2d at 206.

Because Plaintiff has not provided any facts showing he has suffered any actual damages, his claims fail as a matter of law and Wells Fargo is entitled to judgment in its favor.

///

///

///

///

///

13707530.1

- 10 -

1

### III.   CONCLUSION

2       Plaintiff has failed to demonstrate that he is entitled to judgment in his favor.   There is

3   no private right of action for the alleged failure by Wells Fargo to report Plaintiff's account as

4   "disputed."   Moreover, although there is a private right of action for failure to investigate

5   Plaintiff's dispute, there is no disputed fact tending to show that Wells Fargo failed to

6   reasonably investigate.   Plaintiff has not alleged or shown that there was any actual inaccuracy

7   in Wells Fargo's reporting that an investigation would have uncovered.   And Plaintiff has not

8   set forth any facts showing that he has suffered any actual damages.   For all of these reasons,

9   Plaintiff's claims fail as a matter of law, and Wells Fargo is entitled to judgment in its favor.

10

11   Dated: September /2, 2011                    SNELL & WILMER L.L.P.

12

13                                         By: _____
                                               Cynthia L. Alexander, Esq.
14                                             Nevada Bar No. 006718
                                               Jennifer R. Hargis, Esq.
15                                             Nevada Bar No. 11392
                                               3883 Howard Hughes Parkway
16                                             Suite 1100
                                               Las Vegas, NV  89169
17
                                               *Attorneys for Defendant Wells Fargo Bank, N.A.*
18                                             *d/b/a Wells Fargo Auto Finance, LLC, sued here*
                                               *as Wells Fargo Auto Finance, LLC*
19

20

21

22

23

24

25

26

27

28

13707530.1

- 11 -

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action. On this date, I caused to be served a true and correct copy of the foregoing **OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT** by the method indicated:

____X_____   U.S. Mail

_____   U.S. Certified Mail

_____   Facsimile Transmission

_____   Federal Express

_____   Electronic Service via CM/ECF

and addressed to the following:

Timothy P. Harris
4005 Cherokee Rose Ave.
North Las Vegas, Nevada  89031
*Plaintiff Pro Se*

DATED September 12th, 2011

An employee of Snell & Wilmer L.L.P.

Snell & Wilmer
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

13707530.1

- 12 -

# EXHIBIT 1

EXHIBIT 1

Case 2:11-cv-00388-JCM -PAL   Document 25   Filed 09/28/11   Page 39 of 95
Case 2:11-cv-00388-JCM-PAL   Document 18-1   Filed 09/12/11   Page 2 of 2
SEP. 10. 2008   3:01PM     WELLSFFIN7027340975                    NO. 3834   P. 2

## NOTE AND SECURITY AGREEMENT

**IDENTIFICATION OF PARTIES.** In this Note and Security Agreement ("**Agreement**" or "**Loan Agreement**"), the words "**you**" and "**your**" mean each Borrower who signs this Agreement; the words "**we**," "**us**," and "**our**" mean the Lender and its successors and assigns; and the word "**Owner**" means someone other than a Borrower who has an ownership interest in the Collateral (defined on page 2) and signs the Third Party Collateral Agreement on page 2.

**ADDITIONAL TERMS.** The Additional Terms that follow this page are a part of this Agreement and they bind you in the same manner as if they were printed in the first part of this Agreement.

YOUR ACCOUNT IS PAYABLE TO THE LENDER SHOWN BELOW:

**Wells Fargo Financial Nevada, Inc.**
6955 Aliante Parkway
Suite 108
North Las Vegas          NV     89084
Date of Loan    09/10/2008

Account Number   Redacted 9001

# ORIGINAL

| Borrower (Name and Address) | Borrower (Name and Address) | Borrower (Name and Address) | Borrower (Name and Address) |
|---|---|---|---|
| timothy p | | | |
| harris | | | |
| 4005 cherokee rose ave | | | |
| north las vegas        NV    89031 | | | |

### FEDERAL TRUTH IN LENDING DISCLOSURE

| **ANNUAL PERCENTAGE RATE:** the cost of your credit as a yearly rate. | **FINANCE CHARGE:** the dollar amount the credit will cost you. | Amount Financed: the amount of credit provided to you or on your behalf. | Total of Payments: the amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 17.74 % | $   5422.20 | $   10308.00 | $   15730.20 |

**Your Payment Schedule Will Be As Follows:**

| Number of Payments | Amount of Payments | Payments are Due Monthly beginning:  10/25/2008 and on the same day each month thereafter. | Final Payment Due:   09/25/2013 |
|---|---|---|---|
| 60 | $   262.17 | | |

**Late Charge:** If any part of a payment is more than 10 days late, you will be charged a late charge equal to 5% of the full payment.

**Prepayment:** If you pay off this loan early, you will: (a) not have to pay a prepayment penalty, and (b) not be entitled to a refund of part of the prepaid finance charge.

**Security:** You are giving us a security interest in the motor vehicle described on Page 2 of this Agreement.

☐ **Other Property:** _____

**Additional Information:** You can see the rest of this Agreement for more information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

| **ITEMIZATION OF AMOUNT FINANCED** | **Other Transaction Information:** |
|---|---|
| $          0.00  Prepaid Finance Charge | $   10308.00   Principal Amount of the Loan ( the Amount Financed plus any Prepaid Finance Charge) |
| $    10308.00  Amount Financed (Sum of amounts shown below) | 17.74 %   Rate of Interest Per Year |
| $          0.00  Amount Paid on Your Accounts | $          0.00   Prepaid Finance Charge (also called an Origination Fee) |
| $          0.00  NA | |
| $          0.00  NA | Closed By:   FL |
| $    10283.00  Amount Paid to You Directly | |
| AMOUNTS PAID TO OTHERS ON YOUR BEHALF | |
| $        25.00   To Public Officials for License and Title | |

**NOTICE TO CONSUMER: THIS IS A CONSUMER CREDIT TRANSACTION**

**You understand that:**

- **You should not sign this Agreement before you read the writing on all pages, even if otherwise advised.**
- **You should not sign this if it contains any blank spaces.**
- **You are entitled to an exact copy of this and any other agreement that you sign.**
- **This Agreement is the entire agreement between you and us relating to this account. Any change to this Agreement must be in writing and signed by both you and us.**

☐ When this box is checked, itemization is continued on attached addendum.
*We may be receiving a portion of this amount.

**SIGNATURES.** If you agree to be bound by the terms of this Agreement, please sign your name below. All persons signing this Agreement will be fully responsible for payment in full. By signing below, you are authorizing disbursement of the loan proceeds as shown above in the "Itemization of Amount Financed" box. You acknowledge receiving a completely filled-in Agreement.

**YOU ACKNOWLEDGE THE EXISTENCE OF A SEPARATE ARBITRATION AGREEMENT SIGNED CONCURRENTLY WITH THIS AGREEMENT, AND YOU SPECIFICALLY AGREE TO BE BOUND BY ITS TERMS.**

| SIGN HERE | SIGN HERE |
|---|---|
| SIGN HERE | SIGN HERE |

Page 1 of 4                                                                 NV-3841-0905

WF-TH-000071

## ADDITIONAL TERMS

**YOUR PROMISE TO PAY AND THE TERMS OF REPAYMENT.** To repay your loan, you promise to pay us the Principal Amount of Loan together with interest at the Rate of Interest Per Year both as shown on page 1. You will pay this sum to us in United States currency at the payment address shown on your billing statement (or such other location specified by us from time to time) in installments each month according to the Payment Schedule shown on page 1. Payments received at a location other than the payment address on your billing statement may have a delay in processing. You may prepay your loan at any time prior to maturity without penalty. If you make a partial prepayment, there will not be any change in the amount of your monthly payment or delays in due dates of those payments unless we have agreed to such changes in writing. Any Prepaid Finance Charge (Origination Fee) represents a single charge for making your loan, is fully earned on the date of your loan and is not subject to refund.

**INTEREST-BEARING LOAN.** This is an interest-bearing loan. Except as limited by law, the interest on your loan is calculated each day based upon the principal balance of the loan outstanding from time to time, using the Rate of Interest Per Year shown on page 1, until paid in full. Interest accrues on the basis of actual days elapsed and a 365/366-day year. Payments will be applied first to any outstanding fees, then to accrued interest, and then to the principal balance. Accruing interest every day will affect the total amount of interest you pay under this Agreement and the corresponding Finance Charge – your Finance Charge will be less if you pay early and more if you pay late. Any necessary adjustments to the Total of Payments will be reflected in your final payment.

**YOU GRANT US A SECURITY INTEREST.** You give us a security interest in your property described below. This property is called "Collateral." You also give us a security interest in any accessions to and proceeds of the Collateral. Accessions are goods installed in or attached to the Collateral. Proceeds are money or property due to you from the loss, destruction or sale of the Collateral. You also give us a security interest in all Proceeds or refunds related to any insurance or service contract we finance for you. The purpose of this security interest is to protect us if you don't repay your loan, including any refinance, extension, or renewal of your loan, or if you break any promise made in this Agreement.

**THE SECTION BELOW DESCRIBES THE COLLATERAL COVERED BY THIS AGREEMENT:**

[X] Motor vehicle(s) described as follows:

| Year | Make | Model | Serial Number |
|---|---|---|---|
| 2005 | Pontiac | aztec | 3G7DA03E46S520884 |

[ ] Other property:

---

**THIRD PARTY COLLATERAL AGREEMENT**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Owner hereby grants us a security interest in the Collateral to secure your performance under the Loan Agreement. Owner acknowledges that it has the same obligations and makes the same representations under the Loan Agreement as you with respect to the Collateral. For example, Owner has the duty to keep the Collateral insured, to provide us with evidence of insurance upon request, and to cause us to be named a loss payee on Owner's insurance policy. Also, Owner represents that Owner owns the Collateral or a part of it and that no one else, other than you, has any interest in or claim against the Collateral that has not been disclosed to us in writing. Owner assumes no personal responsibility for the payment of any amounts owed under the Loan Agreement. Owner agrees that we may, without releasing Owner from this Third Party Collateral Agreement and without notice or consent from Owner, extend additional credit to you or enter into an agreement with you to modify, extend, or waive the terms of the Loan Agreement.

| Owner Name and Address | | Owner Name and Address | |
|---|---|---|---|
| N/A | | N/A | |
| N/A | SIGN HERE | N/A | SIGN HERE |

---

**LATE CHARGE.** If any part of a payment is more than 10 days late, you will be charged a late charge equal to 5% of the full payment. No late charge will be assessed for a payment if a delinquency is caused only by previously incurred late charges that have not been paid and you have otherwise made a timely monthly payment of the principal, interest and all other charges currently due. Notwithstanding this, however, we may continue to report your account to credit reporting agencies as past due until such time as your payment of all amounts owed (including late charges, CPI (defined on page 3) premiums and other charges) is current.

**RETURNED CHECKS.** If a payment on this loan is made with a check that is dishonored for any reason (except an error by us), you agree to pay us a $ 25 charge. We reserve the right to refuse to accept personal checks for payment on your account and to require payment by cashier's check, money order or other form of guaranteed funds.

**DEFAULT.** Subject to limitations under state or federal law, you are in Default on this Agreement ("Default") if: 1) you don't make the full amount of a required payment when due; 2) you break any promise or condition in this Agreement or in any other security instrument that secures the payment of this Agreement; 3) you provide us with false, misleading or materially incomplete information in connection with your loan application or on any document provided to us; 4) an Owner breaks a promise or condition of the Third Party Collateral Agreement; or 5) any other event occurs that in our judgment significantly decreases the likelihood of your performance or reduces our ability to benefit from the Collateral.

**REMEDIES FOR DEFAULT.** If you are in Default, you agree that subject to limitations under applicable law and without first giving you notice we can: a) require you to pay the remaining balance of this Agreement in full immediately; b) use any remedies available to us by law or this Agreement; c) make a claim for any insurance benefits or premium refunds that may be available as a result of your Default; or d) without first obtaining court approval, take possession of the Collateral wherever it may be found. We may keep the Collateral in full satisfaction of what you owe or sell the Collateral in a commercially reasonable manner. The money that we get from the sale (after paying our costs, including reasonable costs of repair) will reduce the amount you owe. If we get less money than you owe, you will still owe us the difference, unless limited by law. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else, such as a junior lienholder.

**COLLECTION COSTS.** If you are in Default and except as limited by law, you agree to pay all court and other collection costs that are incurred by us and related to your Default, including reasonable attorney's fees.

NV-3841-0805

WF-TH-000072

## ADDITIONAL TERMS, Continued

**CREDIT INFORMATION** We may reexamine and reevaluate your creditworthiness at any time. To do so we may ask you for additional information, obtain your credit bureau report, contact your employer and/or otherwise verify your current credit standing. You agree to submit current financial information to us if we request it.

**ACCORD AND SATISFACTION AND IRREGULAR PAYMENTS.** We may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of our rights under this Agreement. Our acceptance of checks or money orders labeled "payment in full", or words to that effect will not constitute an accord and satisfaction nor a waiver of any rights we have to receive full payment. If you intend to pay your loan in full with an amount less than the total balance we determine is owing on your loan, payment must be sent to Wells Fargo Financial Exception Items, P.O. Box 500, Chester, PA 19016 and not to the payment address indicated on your statement or payment voucher. Please note that such payments will not discharge your full debt if sent to the statement or voucher address and will do so if sent to our accord and satisfaction address only if we agree to accept your payment as such.

**POWER OF ATTORNEY.** You appoint us, through our officers, employees and agents, as your true attorney-in-fact to perform any of the following powers, whether or not you are in Default: a) to execute all documents necessary to perfect, preserve or release our interest in the Collateral and b) to collect, receive and execute payments or other instruments related to insurance claims or losses and to apply such payments, at our sole discretion toward repayment of the obligations of this Agreement or replacement of the Collateral. This appointment shall remain in effect during the term of this Agreement and is a power coupled with an interest (which means you cannot cancel this power of attorney during this Agreement).

**YOU MUST PROTECT THE COLLATERAL.** Unless the Owner is the only person who owns the Collateral, you represent that you own the Collateral or a part of it and that no one else, other than the Owner, has any interest in or claim against the Collateral that has not been disclosed to us in writing. Unless you have our written consent, you promise: 1) not to sell, lease or give the Collateral to anyone else; 2) to keep the Collateral free from claims of others, whether or not justified (for example, forfeiture or seizure for alleged illegal acts; taxes; towing, storage or repair liens; fines; and security interests); 3) to keep the Collateral in good repair and keep it in your possession at your address indicated on page 1 of this Agreement; 4) not to take the Collateral outside the United States for more than 30 days; 5) to operate the Collateral in accord with all applicable statutes, rules and regulations; and 6) to use the Collateral only for personal, family or household purposes. If you fail to keep the Collateral free from claims of others or fail to keep the Collateral in good repair as required under this section, we may pay the claims or pay the cost to repair the Collateral (but we are not required to). When we ask you to, you will pay us the cost of any claims or repairs that we pay.

---

**INSURANCE ON COLLATERAL**
**YOU MUST KEEP THE COLLATERAL INSURED.** You will keep the Collateral insured against physical damage and loss until you pay this loan in full. Collision and comprehensive or all-risk insurance would satisfy this requirement. You may buy the insurance from anyone you want, but the insurance company, the amount of insurance and the deductible, which may never exceed $1,000 unless we agree otherwise, must be acceptable to us. The policy shall name us as a secured party, provide for payment to us in case of loss and require written notice to us at least 10 days before cancellation or changes to coverage. You will give us a copy of the policy or give us other proof of the required insurance acceptable to us.

**COLLATERAL PROTECTION INSURANCE.** If you fail to keep the Collateral insured as required or fail to give us proof of the required insurance acceptable to us, we may, but we are not required to, buy Collateral Protection Insurance ("CPI") to protect our interest in the Collateral. The CPI may, but need not, also protect your interest. If you have not given us proof that the required insurance was in force as of the date of this loan, the effective date of the CPI can be as early as the date of this loan, even if the certificate of insurance for the CPI is not issued until later. If you have given us proof that the required insurance was effective as of the date of this loan, the effective date of the CPI can be as early as the date the required insurance expired or was cancelled, even if the certificate of insurance for the CPI is not issued until later.

**PAYMENT FOR CPI.** You are responsible for the cost of any CPI purchased by us. If we buy CPI, we may add the premium for the CPI to the unpaid balance of your loan and increase your monthly payment to pay the premium during the remaining term of the CPI; or we may require you to pay the full premium for the CPI immediately.

**CANCELLATION OF CPI.** If we buy CPI, you may still obtain the required insurance from the insurance company or agent of your choice. If you do this and give us proof of the required insurance acceptable to us, we will cancel the CPI as of the effective date of the insurance you obtain. If your account is paid off while the CPI is in effect, we will cancel the CPI as of the date your account is paid off. If we cancel the CPI, we will credit any refund of unearned insurance premium to your account. You will remain obligated to pay any earned insurance premium.

**IT IS BETTER FOR YOU TO GET YOUR OWN INSURANCE.** If we buy CPI, it will probably be more expensive and provide less insurance protection than insurance you could obtain from the insurance company or agent of your choice. The amount the CPI will pay may be less than the unpaid balance of your loan and may be less than the full value of the Collateral. We urge you to contact an insurance agent to assist you in evaluating your own insurance needs and to advise you whether other, less expensive, insurance is available.

**LIABILITY INSURANCE COVERAGE.** Liability insurance coverage for bodily injury and property damage caused to others is not included in any CPI coverage we may obtain under this Agreement.

---

**REPAIR OR REPLACEMENT OF COLLATERAL.** If any Collateral is damaged or lost, you will notify us immediately of the loss or damage. You will instruct any insurance company and anyone else liable for the damage or loss to pay any money as a result of the damage or loss (including but not limited to, insurance proceeds) to you and us jointly. Upon receipt, you agree to endorse any such payments and deliver them to us for collection. We may, at our option, either agree to use such payments for the repair or replacement of the Collateral or apply these payments to your debt under this Agreement. If we agree to use such funds for repair or replacement of the Collateral, we may release such funds to you or may hold such funds for payment directly to the vendor providing such services or selling the replacement collateral upon our satisfaction with such repair or replacement. You agree that we won't release any amount to you if you are in Default under this Agreement. If any amount is released to you, you agree that you must repair or replace the Collateral to our satisfaction and must sign any documents or do whatever else is necessary to give us a security interest in the repaired or replaced Collateral. You agree to repair or replace the property promptly.

NV-3941-0905

WF-TH-000069

Case 2:11-cv-00388-JCM -PAL   Document 25   Filed 09/28/11   Page 42 of 95
SEP. 10. 2008  3:11PM  Case 2:11-cv-00388-JCM -PAL  Document 18-1   Filed 09/12/11   Page 5 of 7
WELLSFITN7027349975                                          NO. 5834  P. 5

**ADDITIONAL TERMS, Continued**

**WAIVER AND DELAY IN ENFORCEMENT.** No failure or delay to exercise any right or remedy under this Agreement shall be a waiver of our right to exercise such right or remedy in the future. We do not have to give you notice of any waiver, delay or release. Unless applicable law provides otherwise, we may use our other legal remedies against you before we take possession of any Collateral. You will not be released from your obligations under this loan if we exchange or release any Collateral.

**COMMUNICATION WITH YOU.** You agree that, from time to time, we may monitor and record telephone calls regarding your account to assure the quality of our service. You also agree, in order for us to service the account or to collect any amounts you may owe, that we may from time to time make calls and send text messages to you, using prerecorded/artificial voice messages and/or through the use of an automatic dialing device, at any telephone number associated with your account, including mobile telephone numbers that could result in charges to you.

**ADDITIONAL SIGNERS.** If there is more than one Borrower on this Agreement, each of you remain responsible for this loan even if we fail to notify you that there has been a Default. A Default by one of you will be a Default by all of you. You also agree to remain responsible if we change the terms of payment or release any Collateral without notifying you. If we release any of you from the loan, the rest of you will not be released. We do not have to use our legal remedies against any one of you before we use our legal remedies against any of the rest of you. An Owner has no personal responsibility for the payment of any amounts owed under this Agreement. If any Borrower or Owner dies or is discharged from liability under the United States Bankruptcy Code or similar law, you will still be liable for this loan. A court decree for divorce or separation or a non-court mutual agreement does not affect our ability to enforce this Agreement or collect the outstanding amount owing against all jointly liable parties if we were not a party to the decree or agreement.

**STATE LAW.** The laws of _____Nevada_____ govern this loan and Agreement. The rate and amount of charges are authorized by NRS 99.050 and 99.055, as amended.

**INFORMATION REPORTED TO CREDIT BUREAUS.** If you believe we have reported incorrect information about your account to a credit bureau, you may notify us by writing to us at Wells Fargo Financial, Wharf at Rivertown, 2501 Seaport Drive, Suite 300, Chester, PA 19013-1510, Attention: Customer Service Support. Please include your account number and a description of the information that is incorrect.

☐ If this box is checked, the Amount Financed on Page 1 of this Agreement is $25,000 or less, and the goods purchased with this loan will be used for personal, family or household purposes, the following Notice applies:

**NOTICE**

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Internal Use Only

Control Number:   100000633430

NV-3641-0905

WF-TH-000070

# EXHIBIT 2

# EXHIBIT 2

# LETTER OF DISPUTE:

Credit Dispute
062110
Resolution

JUNE 17, 2010

Timothy Paul Harris
4005 Cherokee Rose Avenue
North Las Vegas, Nevada, 89031
Certified Mail # 7009 3410 0001 0346 7865    Return Receipt Requested

WELLS FARGO AUTO FINANCE
ATTN: CREDIT DISPUTE RESOLUTION
P.O. BOX 29704
PHOENIX, AZ 85038

To Whom It May Concern:
This is a letter of dispute.
I recently pulled my credit report and found WELLS FARGO AUTO FINANCE reporting
derogatory information in my credit report.
I do not agree with the balance on the account and dispute this.

By: _Timothy Paul Harris_____

# EXHIBIT 3

# EXHIBIT 3

**ACDV Response:**

| | | | | 22353443200201001N |
|---|---|---|---|---|
| **Account Number:** | REDACTED 9001 | **SSN:** | 2997 | |
| **Consumer Name:** | TIMOTHY P HARRIS | **Control Number:** | 22353443200201001N | |
| **Response Code:** | 02:Modify account information as indicated | **Subscriber Code:** | 906N714 | |
| **Response Date:** | 06/29/2010 | **DF Contact Number:** | | |
| **Response Due Date:** | 07/21/2010 | **DF Authorized Name:** | FRANCES ALEXANDER | |

**Dispute Information:**

| | |
|---|---|
| **Dispute Code 1:** | 106:Disputes present/previous Account Status/Payment History Profile/Payment Rating. Verify Payment History Profile, Account Status, and |
| **Dispute Code 2:** | |
| **FCRA Relevant Information:** | |

**Consumer Information:**

| | Request Data | Response Data | Same / Diff |
|---|---|---|---|
| **Last Name:** | HARRIS | | |
| **First Name:** | TIMOTHY | | |
| **Middle Name:** | P | | |
| **Generation Code:** | | | |
| **Prev. Last Name:** | HARRIS TIMOTHY PAUL | | |
| **Prev. First Name:** | TIMOTHY P H | | |
| **Prev. Middle Name:** | | | |
| **Prev.Generation Code:** | | | |
| **SSN:** | REDACTED 2997 | | |
| **Date Of Birth:** | 10/00/1970 | | |
| **Telephone Number:** | REDACTED | | |
| **ECOA Code:** | 1:Individual | | |
| **Street Address:** | 4005 CHEROKEE ROSE AV | | |
| **City:** | NORTH LAS VEGAS | | |
| **State:** | NV:Nevada | | |
| **Zip:** | 89031 | | |
| **Prev. Street Address:** | 6213 EAGLE CROSSING ST | | |
| **Prev. City:** | LAS VEGAS | | |
| **Prev. State:** | NV:Nevada | | |
| **Prev. Zip:** | 89130 | | |

WF-TH-000260

| | |
|---|---|
| 2nd Prev. Street Address: | 40005 CHEROKEE ROSE AV |
| 2nd Prev. City: | NORTH LAS VEGAS |
| 2nd Prev. State: | NV/Nevada |
| 2nd Prev. Zip: | 89031 |

## Account Information:

| | Request Data | Response Data |
|---|---|---|
| | | 223534432200201001N |
| Account Status: | 11:Current account. | |
| Payment Rating: | | |
| Cond. / Cum. Status: | | |
| CII: | | |
| MOP: | | |
| CCC: | XB:Account information disputed by consumer. | |
| SCC: | | |
| Portfolio Type: | I:Installment | |
| Account Type: | 00:Auto | |
| Interest Type Indicator: | | |
| Terms Duration: | 060 | |
| Terms Frequency: | M:Monthly | |
| Date Opened: | 09/01/2008 | |
| Date of Account Information: | 08/01/2010 | 08/29/2010 |
| Date of Last Payment: | 08/26/2010 | |
| Date Closed: | | |
| FCRA DOFD: | | |
| Current Balance: | 7867 | 7461 |
| Amount Past Due: | 0 | 0 |
| High Credit / Original Amt.: | 10308 | 10308 |
| Credit Limit: | | |
| Original Charge Off Amount: | | |
| Actual Payment: | | |
| Scheduled Monthly Payment: | 262 | |
| Original Creditor Name: | | |
| Creditor Classification: | | |

WF-TH-000261

WF-TH-000262

**Agency ID:**
**Sec. Mktg. Agency Acct Num:**
**Mortgage ID Number (MIN):**
**Specialized Payment Ind.:**
**Defrd. Payment Start Date:**
**Balloon Payment Amt.:**
**Balloon Payment Due Date:**
**Portfolio Indicator:**
**Purchased From / Sold To:**
**Narrative / Remarks:** ACCT INFO DISPUTED BY CONSUMR

Account History

| Year | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | Req. | | | | | | | | | | | | |
| 2009 | Req. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2008 | Req. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | B | 0 | 0 | 0 |
| 2007 | Req. | - | - | - | - | - | - | - | - | - | - | - | - |
| 2006 | Req. | - | - | - | - | - | - | - | - | - | - | - | - |
| 2005 | Req. | - | - | - | - | - | - | - | - | - | - | - | - |
| 2004 | Req. | - | - | - | - | - | - | - | - | - | - | - | - |
| 2003 | Req | - | - | - | - | - | - | - | - | - | - | - | - |

Associated Consumer Information

**Last Name:**
**First Name:**
**Middle Name:**

WF-TH-000263

| | |
|---|---|
| Generation Code: | |
| SSN: | |
| Date Of Birth: | |
| Telephone Number: | |
| ECOA Code: | |
| CII: | |
| Street Address: | |
| City: | |
| State: | |
| Zip: | |
| Authorized Name: | FRANCES ALEXANDER |
| Date: | 06/29/2010 |
| adjusted to reflect changes noted above. | |

# EXHIBIT 4

# EXHIBIT 4



**Wells Fargo Auto Finance**
Credit Dispute Resolution S4015-01D
Tempe Operations Center
P.O. Box 29704, Phoenix AZ 85038-9704
1-800-55WELLS (1-800-559-3557)
TDD: please use relay service
www.wellsfargo.com

June 22, 2010

Timothy Harris
4005 Cherokee Rose Ave
North Las Vegas, NV 89031

RE: Account # Redacted 9001

Dear Timothy Harris:

Thank you for your recent inquiry concerning the account number referenced above.

We have reviewed our records and determined that the information being sent to the consumer reporting agencies is accurate. If your records do not agree, please provide any additional documentation you deem relevant to support your claim. The additional information should be mailed to the return address listed above or faxed to the Credit Dispute Resolution Department at 866-294-7678.

In addition, we have submitted a request to Experian, Equifax, TransUnion and Innovis to add a dispute indicator to the above referenced account(s). The indicator means you have disputed the accuracy of the information we are reporting. However, if after reading this letter you now agree with the findings of this resolution, please contact us and we will submit a request to have the dispute indicator removed.

If you have any questions, please contact our Customer Service Department at 1-800-559-3557. Hours for calls from Pacific Time zone are Monday through Friday 8:00 a.m. – 6:00 p.m. and Saturday 8:00 a.m. – 12:00 p.m. Hours for calls from all other time zones are Monday through Friday 8:00 a.m. – 7:00 p.m. and Saturday 8:00 a.m. – 12:00 p.m. local time. Our customer service team is ready to answer any questions you may have.

Thank you for choosing Wells Fargo Auto Finance. We appreciate your business.

Credit Dispute Resolution
Quality Control Unit

# EXHIBIT 5

# EXHIBIT 5

| AUD Control Number: | 51108224 | AUD Correction Ind: | 1 |
| Date Submitted: | 06/15/2010 | DF Authorized Name: | LESLIE FENTON |
| Equifax SC: | 152BB18207 | Experian SC: | 3130059 |
| Innovis SC: | 2036170 | TransUnion SC: | 8972061 |

| Last Name: | HARRIS | Prev.Last Name: | |
| First Name: | TIMOTHY | Prev.First Name: | |
| Middle Name: | P | Prev.Middle Name: | |
| Generation Code: | | Prev. Generation Code: | |
| Street Address: | 4005 CHEROKEE ROSE AVE | Prev. Street Address: | |
| City: | NORTH LAS VEGAS | Prev.City: | |
| State: | NV-Nevada | Prev.State: | |
| Zip: | 89031 | Prev.Zip: | |
| SSN: | ____ 2997 | DOB: | 10/09/1970 |
| | | | |
| Telephone Number: | | | |
| CII: | | | |
| ECOA Code: | 1:Individual | | |

| Employer Name: | | Street Address: | |
| Occupation: | | City: | |
| | | State: | |
| | | Zip : | |
| | | | |
| Account Status: | 11:Current account. | | |
| Payment Rating: | | | |
| Account Number: | REDACTED9001 | | |
| Special Comment: | | | |
| Compliance Condition: | XB:Account information disputed by consumer. | | |
| Portfolio Type: | I:Installment | | |
| Account Type: | 00:Auto | | |

WF-TH-000254

| Interest Type Indicator: | | | | | | | | | Scheduled Monthly Pymnt: | 262 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terms Duration: | 60 | | | | | | | | Original Creditor Name: | | | | | | |
| Terms Frequency: | M:Monthly | | | | | | | | Creditor Classification: | | | | | | |
| Date Opened: | 09/10/2008 | | | | | | | | Portfolio Indicator: | | | | | | |
| Date Of Last Payment: | 05/25/2010 | | | | | | | | Purchased From / Sold To: | | | | | | |
| FCRA DOFD: | | | | | | | | | Specialized Payment Ind.: | | | | | | |
| Date Of Acct Information: | 06/22/2010 | | | | | | | | Defrrd. Payment Start Date: | | | | | | |
| Date Closed: | | | | | | | | | Balloon Payment Amt.: | | | | | | |
| Current Balance: | 7867 | | | | | | | | Balloon Payment Due Date: | | | | | | |
| Credit Limit: | | | | | | | | | Agency ID: | | | | | | |
| Original Charge-Off Amt: | | | | | | | | | Sec. Mktg. Agency Account Number: | | | | | | |
| Actual Pymnt: | | | | | | | | | Mortgage ID Number (MIN): | | | | | | |
| Amt Past Due: | 0 | | | | | | | | | | | | | | |
| High Credit / Orig. Amt.: | 10308 | | | | | | | * | | | | | | | |
| | | | | | | | | | | | | | | | |
| 2010 | | | | | | | | | | | | | | | |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| 2008 | 0 | 0 | 0 | B | - | - | - | - | - | - | - | 0 | | | |
| 2007 | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| 2006 | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| 2005 | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| 2004 | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| 2003 | - | - | - | - | - | - | - | - | - | - | - | - | | | |

| Last Name: | |
|---|---|
| First Name: | |
| Middle Name: | |
| Generation Code: | |
| SSN: | |
| Date Of Birth: | |

WF-TH-000258

Telephone Number:

ECOA Code:

Cll:

Street Address:

City:

State:

Zip:

Authorized Signature: | Sal Tolento

Date: | 06/22/2010

When you sign this form, you certify that your computer and/or manual records have been adjusted to reflect any changes made.

WF-TH-000259

# PE-THUF-016

Written Testimony

Before The

## HOUSE COMMITTEE ON FINANCIAL SERVICES

Regarding

"Fair Credit Reporting Act: How it Functions for Consumers and the Economy"

June 19, 2007

Submitted by: Leonard A. Bennett
Consumer Litigation Associates, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia
(757) 930-3660
(757) 930-3662 (fax)
www.myfaircredit.com
www.consumerlawusa.com
email: lab@clalegal.com

on behalf of the
National Association of Consumer Advocates
1730 Rhode Island Ave., NW, Suite 710
Washington, DC 20036
202-452-1939
202-452-0099 (fax)
www.naca.net

Chairman Frank, Ranking Member Bachus and other distinguished members of the Financial Services Committee, the National Association of Consumer Advocates (NACA) thanks you for inviting us to testify today in this important hearing to consider the adequacy of the Accuracy and Reinvestigation protections of the Federal Fair Credit Reporting Act.

My name is Leonard A. Bennett. I have been asked to appear before you on behalf of NACA, a non-profit association of attorneys and consumer advocates committed to representing customers' interests. Our members are private attorneys, JAG officers from the various service branches, state attorneys general deputies and other public sector attorneys, legal services attorneys, law professors and law students whose primary focus is the protection and representation of consumers.

I am a consumer protection attorney. I have practiced law in Virginia since 1994 and in North Carolina since 1995. I have also been admitted to and litigated consumer cases in District Courts across the country. Over the last five years alone, I have spoken at numerous State Bar CLE programs, national Consumer Protection and FCRA conferences and seminars and have regularly taught the Army and Navy JAG school courses on FCRA, Identity Theft and Consumer Protection issues. More than anything else, my practice is devoted to the private enforcement of the FCRA. By most accounts, I have prosecuted more federal claims against Equifax, Trans Union and Experian, as well as many of the nation's largest credit data furnishers, than all but a few advocates. I have received published FCRA decisions from my cases and I have lost only four FCRA cases out of hundreds prosecuted. I have been asked to represent NACA today because of the industry knowledge I have gained by this focused litigation experience.

In most ways, this testimony is directly against my self-interest. Given the current state of affairs and industry non-compliance, our law firm has far more FCRA cases than we can handle. The public, and thus jury pools, are sympathetic. And business for me personally has never been better. If you fix these problems, I would be out of a practice. However, I was not asked to speak today in support of my own self-interest. Rather, I am charged by NACA to speak as a consumer advocate. The problems I discuss herein are not simply those of my retained clients. Instead, they are the difficulties and industry failures imposed on all consumers.

-2-

On each of you, on your staff and even more importantly, on your constituents, every one of which will have a credit file, many of which will be inaccurate.

You have received communications and testimony from the official spokespersons and government relations professionals for the industry. I do not profess to have the Washington experience, let alone political savvy of the CDIA attorney, Anne Fortney, or the CDIA lobbyist, Stuart Pratt, employed by Equifax, Trans Union and Experian. What I can offer that each of these alternate witnesses lack is real world knowledge. I have actually read the manuals and internal documents of the national reporting agencies and have taken the depositions of their employees and agents, from the lowest level outsource vendors to the highest officials and in-house attorneys. I have interviewed hundreds of consumers impacted and harmed by credit industry misconduct. In contrast, and with all due respect, I can offer all takers our transcript of the deposition of Anne Fortney, an attorney who represents the CDIA lobbyist team, and her concession that she had not read the subject investigation procedures. And I have already provided internal emails between Ms. Fortney, Mr. Pratt, and the top attorneys from the "Big 3" reporting agencies, in which the CDIA lobbyists acknowledged a lack of substantive knowledge of agency data and procedures.

**OVERVIEW**

In 2003, I was invited to testify before the appropriate Financial Services subcommittee, then presided over by Representative Bachus. As I intend to do herein, I provided specific deposition testimony and live knowledge from FCRA litigation. At that time, I cautioned that we were heading to a point in the credit industry's evolution where it would be completely automated. Now, four years later, I can state without condition that we have arrived at that point. All important components of the credit reporting system are automated. What human involvement remains is solely that of data entry, much of it accomplished overseas. Anyone who tells you otherwise is not being truthful.

*All Studies Show Significant Inaccuracy in Credit Reporting.*

The present credit reporting system is broken. Every analysis or study accomplished in this decade, including the FACTA authorized FTC Pilot Study has found inaccuracies in a significant percentage of the reports considered. Identify theft, very often a misdiagnosed "mixed file" problem, again puts credit reporting inaccuracies at the top of the list of Federal

Trade Commission complaints, 246,035 complaints in 2006 or 36% of the FTC total.  The FTC actually estimates the total number of consumers affected by identity theft as in excess of 10 million.  The credit reporting agencies receive a rising number of consumer disputes complaining of millions of inaccuracies in their credit reports.  Remarkably, when consumers requested a free copy of their report after suffering a credit denial, 75% thereafter informed the bureaus that the report was inaccurate.[1]  This Congress can see the failures in the system.  Consumers are terrified about the potential impact of credit data leaks because of their correct perception of the ease of identity theft and the difficulty of correcting credit inaccuracies resulting there from. More dangerous for the economy is the fact that credit data has also become a far less effective predictor of future credit behavior.  Bankruptcies again are rising.  Mortgage and car loan defaults are heading out of control.  The credit reporting industry, champions of automated credit decisioning and proponents of the predictive reliability of their credit data, cannot now argue that their systems and files have made the economy stronger, stable and more predictable.

### National Consumer Reporting Agencies are Profiting from Inaccuracies.

The credit reporting industry response to these problems has been shocking.  Rather than increase resources and attention to develop solutions to these inaccuracy and identity theft problems, the national reporting agencies have cut their per capita resources for resolving consumer disputes at the same time they have rushed to maximize profits from same.  For example, Equifax pays its outsource vendor in the Philippines between $.41 and $.57 to process each consumer dispute letter it receives.  But through the agencies' E-Oscar system, they charge no less than $.25 from their creditor customers for each ACDV dispute form sent electronically. Thus, if a consumer disputes five inaccurate accounts after a file is mixed or an identity stolen, Equifax would pay its vendor a fraction of the gross amount (e.g. $1.25) it charges its creditor customers through E-Oscar.  In fact, the more automated disputes it sends out, the more money it generates.  It is this "revenue" opportunity that in 2005 caused the national reporting agencies to move the E-Oscar electronic system from their non-profit lobbying organization, the CDIA,  to a new for-profit company, Online Data Exchange, L.L.C.  I am restricted from offering any further details because of a CRA insisted Protective Order.

---

[1]

The national CRAs have developed another new and even more substantial profit center based on consumer fear of inaccuracies in credit reports. Each agency markets a credit-monitoring product directly to consumers. For example, Experian has branded and marketed by large television buys its misnamed service www.freecreditreport.com. As the agency reported to its shareholders on May 23, 2007:

> Consumer Direct [*online credit reports, scores and monitoring Services*] delivered excellent growth throughout the period, with strong demand from consumers for credit monitoring services, which led to higher membership rates.

On its internet home page, www.equifax.com, Equifax sells its credit monitoring products to consumers stating: "Make sure your reports are accurate & free of fraud." In its most recent quarterly filing, the agency reported that its sale of these reports and its credit monitoring products directly to consumers had generated no less than 10% of its operating revenue and one sixth of its credit reporting revenue. Ironically, all three agencies market products with "identity theft" insurance to provide attorneys fees and expenses necessary to obtain the correction of their credit reports from those same agencies. Thus, consumers are faced with what can fairly be described as credit extortion. Consumers are told to buy the CRA products or else remain in fear that they will be inaccurate and full of fraud.

It bears noting that these problems and concerns may not face an identified celebrity, regulator or government official. Each of the Big 3 CRAs maintain a list of consumers they identify as "VIP" files.[2] Trans Union's employee witness testified:

> Q.      And some references have been made in prior cases to maybe a VIP category. Is there such a category? [. . .] For example, if a lawyer makes a dispute, its handled by your department?
> A.      That is correct.
> Q.      If a politician or [a person] known to be a politician makes a dispute, are those the types of disputes you might handle?
> A.      Yes.
> Q.      And celebrities as well?
> A.      Yes.[3]

These files, which also include CRA employees, for likely the obvious reasons receive special treatment. They are handled by high level employees. In fact, for Equifax and Trans Union, the

---

[2] The title "VIP" is not contrived for this testimony. It is the actual title to the status and is detailed in CRA manuals.
[3] Mullins v. Trans Union, et al, Deposition of Shontese Norwood, September 21, 2006.

remarkable difference is that they are handled by an agency employee actually located in the United States.

### The Credit Reporting System is Concentrated in the Control of Three National CRAs

There are three major national consumer reporting agencies – CRAs. Equifax publically traded and based in Atlanta. Trans Union privately held and based in Chicago. Experian, formerly TRW, British owned and publically traded with U.S. operations based in Costa Mesa, California. Over the last decade, the Big-3 agencies have consolidated data control and ownership by repurchasing their former affiliate territories. While reporting was largely regional years ago, it is now entirely national.[4]   The Big-3 long ago created the Associated Credit Bureaus (ACB), which in the early part of this decade changed its name to the Consumer Data Industry Association (CDIA). The CDIA claims a large membership total, but this is deceiving. I cannot share certain information because Equifax has bound me by a Protective Order from doing so. But the CDIA documents we have produced evidence almost total control by Equifax, Trans Union and Experian. Experian currently heads the Board of Directors. You can also review the CDIA email exchanges discussing its current testimony and observe the total control of the organization by the Big-3 agencies.

### The METRO 2 Reporting Format is a Positive Development.

Years back, the CRAs created a uniform reporting format, Metro. It had considerable limitations and has now been almost entirely replaced by the newer format, Metro 2. This is certainly the most important and economically important product of the CDIA. The Metro 2 format creates a means for creditors and collection agencies to organize and report their data in a consistent manner for each of the three agencies. No one can dispute its importance or success. The format was created by the "Metro Task Force" between the three agencies through the CDIA. It is documented by the Credit Reporting Resource Guide easily obtainable from the CDIA. Metro 2 reporting works like this: A creditor maintains its account records and historical data in its own unique database. It will then adopt a computer program, or hire an outside vendor, to convert that data on a monthly basis out of the creditor-specific format and into Metro 2 format. It will furnish to each CRA one line of Metro 2 code for each of its accounts. Every space in the Metro 2 code line will represent part of a specific field. For example, information

---

[4] A primary exception is CSC which technically "owns" Equifax's consumer files in certain states. Equifax and CSC have a complicated contractual relationship to divide up royalties and income when their businesses intersect.

placed in certain spaces will be interpreted as last name. Other spaces will be extracted by the CRAs as the social security number. Others will uniformly represent account number. In these monthly Metro 2 data dumps, the creditors will also report whether the account is current, or, if not, how late on payment (*e.g.* 30, 60, 90 days or more, Chargeoff, Foreclosure). The Metro 2 code line for an account will also indicate what the balance is on the account, what the minimum monthly payment is, and when the last payment was made. If the subscriber reports information incorrectly in the Metro 2 code line, it will be entered into each CRA's credit file incorrectly.

The Metro 2 format is remarkable because it allows, and we argue should require, subscribing creditors to furnish complete data on their accounts. However, as I discuss below, the CRAs treat most of their Metro 2 fields as creditor optional. Thus, though they have the contractual and procedural means to ensure complete data through Metro 2, they chose not to do so.

## CREDIT REPORTING INACCURACIES

### Mixed Files.

Many credit reporting inaccuracies are caused entirely by the CRAs. These are typically the "mixed file" cases and their related offshoot "identity theft." There are multiple causes of "ownership" inaccuracies in which a credit account or other item belonging to one person appears in the credit report of another. One of the ways this can occur, as discussed below, is through inaccurate reporting by a creditor. Another common explanation – mixed or merged files – is caused by the way reporting agencies match data to files.

Mixed or Mismerged files are now a frequent problem. One study found that 44% of consumer reporting complaints to the FTC involved mismerged files. Of these complaints, 64% had total strangers' files mixed in with the consumer's, while 36% involved information belonging to relatives or former spouses.[5] A study of credit scores for mortgage applicants by the Consumer Federation of America and the National Credit Reporting Association found that one in ten files (155 out of 1545) contained at least one, but as many as three additional repository consumer reports and that it was very common for the additional reports to contain a

---

[5] U.S. Public Interest Research Group, *Credit Bureaus: Public Enemy #1 at the FTC*, October 1993. In this sample, U.S. PIRG analyzed 140 complaints to the FTC.

mixture of credit information, some of which belonged to the subject of the report requested and some which did not.[6] Common reasons for the additional reports include:

- Confusion between generations with the same name (Jr., Sr., II, III, etc.).
- Mixed files with similar names, but different social security numbers.
- Mixed files with matching social security numbers, but different names.
- Mixed files that listed accounts recorded under the applicant's name, but with the social security number of the co-applicant.
- Name variations that appeared to contain transposed first and middle names.
- Files that appeared to track credit under the applicant's nickname.
- Spelling errors in the name.
- Transposing digits on the social security number.[7]

Mixed files are caused almost entirely by the aggressive matching procedures at each of the national CRAs. When Metro 2 code lines are furnished to the CRAs in large monthly batches, the CRAs uses an automated matching system using a mathematical algorithm that integrates certain business rules determined by CRA policy. For example, the CRA will weight certain identifying segments, such as first name and a 7 of 9 digit social security number match heavily and will weight far less last name and even address. A substantive explanation of the CRA matching process was provided in a 2005 deposition of Equifax's Vice President of Technology:

> Q. And what is required to match a tradeline to an existing file?
> A. We use the L90 search logic, which has 13 matching elements, and based on those 13 matching elements, we have an internal algorithm that makes the determination whether the ID matches sufficiently to apply the trade.
> Q. If a first and last name and the full social security number on the tradeline match an existing file, would Equifax report that tradeline to the existing file?
> A. Yes, given there was not other information that was in conflict that prevented that, that kind of took away from the positive match of a name and a Social then, yes, I believe it would. I would like to see the specific example, though.
> Q. What if the current address is on the existing file and the new tradeline did not match?
> A. If the Social Security number matches, that's normally enough information to allow it to update, even if the address does not match.[8]

---

[6] Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, p.21, December 17, 2002, *available at* www.consumerfed.org/121702CFA_NCRA_Credit_Score_Report_Final.pdf.
[7] *Id.*
[8] Beck v. Equifax, et al, Deposition of Phylliss Dorman, August 1, 2005.

If the specific account meets a certain matching score threshold for an existing credit file, it will be added to that file.  If there is not an existing file with an exact match to the account data, the CRA process will allow partial data matched accounts to be reported to a file.  There may only be a file which matches some of the account id segments.  These could include a partial matching name, for example John Watson and John Watts, or Jeff Franks and John Franks.  Or the file match to the account may include only a partially matched address, such as 1200 First Avenue and 4516 S. First Landing Street.  Typically, the closeness of the match between an account and an existing file is scored or scaled and then the account is placed in the credit file with the closest match.  The closer the match to a file, the higher the correlation score.   The FTC refers to this process as "file building."[9]

One of the greatest problems with a Mixed File is the CRA refusal to construct business rule barriers to prevent and resolve further credit inaccuracies that result.  A Mixed File, for the same reasons true for Identity Theft, is like a virus.  Most consumers do not understand what is happening and, without industry knowledge, have no idea how the problem spreads.  Mixed Files occur because of some matching identifier, such as address, in the consumer's file.  Until that identifying segment is corrected or suppressed, or unless the CRA manually edits the file, the mismerge will continue and likely become worse.  For example, in Ms. Dugger's case, she devoted half a decade to recovering her credit after a combination mixed file/identity theft problem.  Each time she was turned down for credit, she would request her credit report and dispute the accounts that were not hers.  Each time, the CRAs would delete the disputed accounts.  And each time new mixed accounts would appear.  In litigation, we obtained the CRA internal documents and learned what was happening.  The CRAs continued to mix my client's file with an out of state consumer with the same first and last name.  The CRAs had inaccurately added the third party's middle initial to my client's file.  Every time an account was reported with that middle initial, it was placed in my client's file.  Another "virus" problem with mixed files is caused by the cross pollination between the CRAs and their subscribers.  In the unrelated cases of Mr. Daniels and Mr. McCue, the respective CRA had added the inaccurately matched identifying segments (address) to my client's file.  Before the consumer could dispute the

---

[9] FTC, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, at 9 (Dec. 2004).

incorrect address, it was provided by the CRA to one of the creditors of the respective similarly-named third party.  Thereafter, those creditors reported through their own monthly Metro reporting to each CRA the inaccurate addresses they had obtained through the skip trace credit reports.

Mixed files are also a growing problem for attorneys who institute collection lawsuits and the often innocent consumers they unwittingly sue.  One of the first steps a collection attorney will take when he receives an assigned file is to request a skip trace from one of the national CRAs.  These reports are often the broadest matched files provided by the bureaus.  It is now very common for the collection attorney to receive an incorrectly matched report and to thereafter sue the similarly named but wrong consumer.  I suspect that the Committee can substantiate this growing problem by randomly choosing any attorney with an active collections practice.  Similarly, consumer mortgage reports are often generated with a loose match algorithm.  I thus also suspect that the Committee can substantiate this problem with an inquiry to a randomly selected realtor, mortgage broker or underwriter.

Most know by now of Mr. Carroll's difficulties in Massachusetts in which all three CRAs mixed his credit file.  In fact, in preparation for this very hearing, the CDIA noted that Mr. Carroll's credit file still was not corrected.  While brought to the Committee's attention by the Boston Globe, this "mixed file" problem, discussed below, is very common.  In my 2003 testimony, I offered:

> As common in my case portfolio are those claims we describe as "merged identity" cases.
> As easy as it is for an identity thief's credit files to be combined with that of an innocent
> consumer, it is even more likely to happen to persons of similar name and address or
> social security number.  The credit reporting industry is now almost entirely automated.
> Its file searches do not require full identifying information -either to obtain a credit report
> or to furnish information to the bureau.  As a result, I have been asked to help Sandra K.
> Brown, who had perfect credit, when Equifax could not keep the files of Sandra M.
> Brown from merging.  And Mary E. Jones and Mary W. Jones, who because of their
> similar names and addresses had both of their identities combined by Trans Union.  Or
> Teresa B. Davis, who lived on the same street as had Teresa G. Davis several years prior
> and had much better credit before Equifax merged the two files.  These are my cases,
> solely out of Newport News and Hampton, Virginia.  But, there is nothing about this
> problem which is unique to my community.  It is happening everywhere throughout
> America.  And while no one consumer is truly immune from it, the problem is much
> worse for consumers with common surnames, particularly those who share their name
> with multiple generations.

-10-

Now, in addition to the names of Mrs. Brown, Ms. Jones and Ms. Davis, we can add as well Mr. Carroll. Since 2003, the list of litigated mixed file cases has grown considerably. The National Consumer Law Center discussed a sampled few. The Committee can add to such examples Linda Johnson. In 2003, I discussed a then-pending Fourth Circuit appeal, <u>Johnson v. MBNA</u>. The case was decided favorably for consumers and was the subject of considerable industry reaction. It was considered by the FTC in its recent Reinvestigation Report. The Court of Appeals held that a FCRA investigation must be a "searching and meaningful inquiry" to determine the actual status of an account. Remarkably however, <u>after spending several years litigating for the deletion of her ex-husband's account from her credit file, Linda Johnson came back to me for an entirely new matter. Equifax and Trans Union had merged Ms. Johnson's credit file with another Newport News woman with the same name. It took another year of litigation to again clear her good name.</u>

More recently and more tragically is the case of Kenneth Baker. Mr. Baker had his financial life combined with that of a similarly named total stranger by all three CRAs. <u>The bureaus placed tax liens and defaulted accounts on his credit file and made it impossible for him to move on and survive a difficult part of his life. Mr. Baker took his own life in 2006.</u> The CRAs were mentioned prominently in Ken's final note to his surviving daughter who now fights for some principled justice.

Another troubling and common mixed file problem is when the CRAs combine a parent's credit file with that of a child, as with my client Mr. Payne, or one sibling's file with that of another, such as the pending case of Mr. Schubert. If two consumers have a similar name, even if not exact, and also share either an address or a social security number matching seven of nine digits, the CRAs will very often combine the two files. The CRAs make little accommodation for a son who at some point lived with his parents and shares his father's name (or a close proximity). They make even less for a consumer who received a social security number at the same SSA Office and within a proximate date range as their prodigal sibling. These cases are often the most difficult as they result in even greater division and animus between family members. Creditors and CRAs alike aggressively use the relationship as leverage to obtain payment from the otherwise innocent family member.

-11-

These examples are only but a small fraction of the total number of mixed file cases ongoing at any one time. We have represented countless other mixed file victims – to many to name - many incorrectly believing they were identity theft victims. These cases have been brought across the nation by various NACA members and the consumers they represent. We may well have represented one or more of your own constituents so victimized by a mixed file.

### *Identity Theft*

This sort of mismerging further aggravates the effects of identity theft. In fact, identity theft is a misnomer. The criminal actually steals from the creditor using only a partial set of a consumer's identifiers. In makes little sense for a criminal to apply for a credit card using the full name and address of the consumer victim. In most instances, beyond the less common mailbox theft, all that would accomplish is the opening of a new account available only to the innocent consumer when he receives the new card. The modern identity theft is accomplished by manipulating the use of some consumer identifiers and not others in a manner that takes advantage of the CRA's loose match policies. For example, the fraudster may use the consumer's first name, but add his own last name, use the consumer's social security number and add a new mailing address. If the consumer has not previously alerted the CRA to a fraud, the CRA will match the data to the consumer's file and provide to the new creditor for the benefit of the identity thief a credit report that will survive the application process. Accordingly, "identity theft" is really only an initial genesis of the problem. It is instead better understood as a form of a mixed file.

In this era with heightened media attention to the problem of identity theft, many consumers incorrectly presume that the appearance of an item which is not theirs is the product of criminal activity, fraud or identity theft. This is very often not the case. Instead, the CRA may simply have mismatched accounts of two otherwise innocent consumers.

Identity theft is made much easier by the CRA refusal to impose meaningful verification requirements on their customers. Often, the creditor requesting a credit report will provide far less information to obtain the report than the CRAs will require from a consumer making a dispute. When a creditor or potential creditor requests a consumer report, the Big 3 CRAs require very little information in the inquiry. The customer is not even required to provide the social security number of the applicant consumer. Some do not provide full names. The CRAs

-12-

will furnish a consumer report that is the closest match to whatever data the customer provides in the inquiry. One CRA, Equifax, will furnish every file that is a potential match.

Accordingly, while Congress, the FTC, and other Federal and State officials should continue to battle the criminal aspects of Identity Theft, the Committee must recognize that the mechanics of the problem are in significant part the fault of the national CRAs.

### *'Ownership' Disputes.*

Certainly not all inaccuracies originate with the reporting agencies. In fact, many will start upon the furnisher's reporting. Creditors often attribute their account to a consumer who does not owe the debt. Most frequently, the furnisher is incorrectly attributing the "ownership" of the account to a spouse or other authorized user who is not contractually liable. Other times, the consumer may have been the victim of an identity theft where a third party fraudulently opened an account for which the furnisher is now incorrectly attributing ownership. According to CRA statistics, these "ownership" disputes are the most common. The CRAs use the dispute code "Consumer states account is not his/hers" over 30% of the time.

To understand the context of these errors, you need to understand the objectives and motivations of creditors and collectors in the credit reporting system. Creditors and debt collectors report their accounts under contractual obligation to the CRAs and in order to ensure the collection and payment of their billed accounts. When I began the practice of law shortly after graduating law school in 1994, most unpaid or late debts were collected through dunning letters, phone calls and ultimately small claims collection suits. Today, this is much less often the case. The first means of collection is via credit reporting.[10] In fact, many debt collectors do not attempt collection by any other means. They often will report such debts to spouses. And in many such instances, this reporting is accomplished without any review of underlying account documents.[11]

A consumer's discovery that a creditor or collector is reporting the debt of another in his or her credit report is usually the start of a credit reporting ordeal. Sometimes the reported debt is recognized as belonging to a relative or spouse. Some creditor's such as credit card giants MBNA, now merged with Bank of America, and Capital One are renowned for their deliberate

---

[10] Rivera v. Bank One, 145 F.R.D. 614, 623 (D.P.R. 1993) (a creditor's report of a credit card debt to a CRA is a "powerful tool designed, in part, to wrench compliance with payment terms from its cardholder")

[11] Another new means of modern collection is often the initiation of distant "arbitration" proceedings to which consumers rarely respond, another important issue not now before this Committee.

reporting of accounts to an authorized user spouse.  The problem is that many large creditors deliberately destroy or do not retain the underlying account records to support their account reporting.  For example, in a 2006 case more recent than the also on-point 2004 Fourth Circuit decision in Linda Johnson v. MBNA, a District Court in North Carolina considered the common proposition in the credit industry that a creditor may report a debt even if it could not otherwise establish its validity.  In the somewhat similarly named, but unrelated, Sara Johnson v. MBNA case, the Court explained (and rejected) this industry argument:

> MBNA says its inability to produce a signed application indicating that Plaintiff opened the account is "irrelevant." According to MBNA, it is obligated to retain such records for only two years, pursuant to 12 C.F.R. § 226.25(a) (2005) (Truth in Lending, Regulation Z). (MBNA's Reply Mem. at 5.) However, Section 226.25 concerns only those records which constitute "evidence of compliance" with Regulation Z and states that the two years begin to run "after the date disclosures are required to be made or action is required to be taken." Thus, it may not apply in this case at all. Moreover, MBNA has not produced any records to support its assertion that Plaintiff is a joint obligor on the account, such as the original application, Plaintiff's signature for purchases made with the card, her involvement with or use of the cash withdrawn on the account, or payments on the account made by Plaintiff. Instead, MBNA relies on computerized notations that are inconclusive[.]  . . . It is axiomatic that a bank must have more than a person's name on the account statement to establish liability. The court cannot accept MBNA's assertion that Section 226.25 absolves it of an obligation to produce any proof of Plaintiff's liability on the account. *Accord* Linda Johnson v. MBNA Am. Bank, N.A., 357 F.3d 426, 432 (4 Cir.2004) ("jury could reasonably conclude that if ... MBNA no longer had the application, they could have at least informed the credit reporting agencies that MBNA could not conclusively verify that Johnson was a co-obligor")[.].[12]

Over the last decade, debt collection tactics have changed.  Particularly with the massive identity theft problem, proving in a small claims court that a consumer is liability by a "preponderance of the evidence" has become unnecessary.  The *de facto* burden of proof has shifted and now consumers are forced to prove the negative – to disprove their obligation on a debt.  Failing their ability to do so, the creditor or collector will continue to report the consumer's responsibility.   In fact, in our litigation of the Linda Johnson v. MBNA case, we learned from MBNA's account records that the consumer was expressly told, "It is not our burden to prove you owe the debt. It's your burden to prove you do not."

---

[12] Johnson v. MBNA America Bank Nat'l. Ass'n, 2006 WL 618077, n.7 (M.D.N.C. 2006).

Several years ago, the FTC took a rare enforcement action under the FCRA against a debt collector who had espoused the same arguments now so dominating the credit industry.[13] The debt collector was reporting debts to consumer credit files without any attempt to verify same through actual account records. The FTC was successful in obtaining the reporting collector's compliance through a consent order requiring reporting after dispute only when the collector had reviewed the actual underlying account records. This was the only FTC enforcement action of its kind. If the Commission were to more vigorously enforce these same standards today, it could dramatically reduce this type of inaccurate reporting.

### Credit Limits and Other Incomplete Reporting.

Many credit reporting errors occur because the furnisher has not complied with industry reporting standards, such as METRO 2, and the CRAs have not enforced the requirements of these standards. I will address three examples of such problems.

### Withholding Credit Limits and Account Data.

Inaccuracy and incompleteness occurs when lenders intentionally withhold positive payment histories or reporting data from the credit reporting agencies for accounts they otherwise report. Mortgage lenders and credit card issuers often do so for strategic reasons. Their asserted objective is to shield their customers from competing lenders who might otherwise solicit them. This practice, which is especially common among subprime lenders, results in credit reports that do not accurately reflect the positive payment histories for borrowers, especially high-interest borrowers in the subprime market.[14] The Comptroller of the Currency suggested that legislation may be required in order to ensure that such information is reported and consumers are protected from such incomplete reporting.[15] Currently, one large credit card lender, Capital One, refuses to report the credit limits for their customer accounts.[16] Recently another, possibly Citibank, appears ready to cease reporting its limits. One of the most heavily weighted parts of a credit score is "credit utilization" which measures the proportion of a

---

[13] United States of America v. Performance Capital Management
[14] Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, December 2004, p. 12.
[15] Office of the Comptroller of the Currency, *Press Release NR99-51*, June 6, 1999, *available at* www.occ.treas.gov/ftp/release/99-51.wpw.
[16] Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, December 2004, p. 12-13.

consumer's total revolving credit which is then being used.[17]  When a credit card company does not report its customer's credit limit, the reporting agencies substitute the historical value for the highest amount of credit ever used on the account.  This can negatively impact a consumer's credit score.  This inaccuracy is difficult to diagnose as the consumer will not receive a paper credit report which lists the high credit value in the credit limit field.  Instead, the agency computers essentially publish two different reports – one that then enters the scoring algorithm and the one which is printed in narrative form and shown to the consumer.  As there are approximately 50 million outstanding Capital One accounts, the number of consumers affected is certainly in the tens of millions.

In considering this issue in its report, the FTC absolved the CRAs from responsibility for these problems upon the assertion from the CDIA that respective creditors may simply forgo the use of their credit reporting services if the CRAs demanded credit limit data.  It is unbelievable that the CRA claim that Capital One would cease using national credit reports received any attention let alone was taken seriously by the FTC.

### Post-Bankruptcy Discharge Reporting.

One of the most prevalent credit reporting problems over the last several years is the failure of the reporting system to provide consumers a "fresh start" after a bankruptcy discharge.  Creditors frequently fail to report an updated status for discharged accounts or continue to report their pre-discharge status and balance.  Reporting agencies do not update tradelines and judgments they otherwise know have been discharged.  My office has represented at least a dozen consumers who were forced to file federal lawsuits to obtain the correction of their credit reports.  We are also currently involved in a national case in California targeting the same inaccuracies.  Across the country there are scores if not hundreds of such claims active in various stages of federal litigation.

Under the METRO 2 reporting format, a bankruptcy discharge is an account "condition" reported for each consumer who filed.  The effect of a bankruptcy on a consumer's credit score is of course initially devastating.  However, it is a static event and, all other things equal, a consumer's credit score will continue to improve each day that passes post-discharge.[18]

---

[17] http://www.myfico.com/CreditEducation/WhatsInYourScore.aspx.
[18] See e.g. http://moneycentral.msn.com/content/Banking/bankruptcyguide/P108797.asp.

Post-bankruptcy inaccuracies are caused by both furnishers and reporting agencies. A very significant number of creditors never report a pre-Bankruptcy Petition tradeline or collection account as discharged or "included in bankruptcy." Often, when a creditor receives notice of a bankruptcy filing, it simply re-codes its internal account record to reflect the discharge and to avoid violating the bankruptcy stay. This may result in the account never again being reported to the credit bureaus. However, because the CRAs are accustomed to receiving only partial account information or histories, they continue to report the last known status and balance. For example, assume a lender reports a debt as 120 days late on December 31. On January 1, it receives notice of the bankruptcy and internally closes the account. Unless that creditor then re-reports with the new discharge status, the last reported information will be the pre-bankruptcy 120 days late.

Alternatively, some creditors may continue to report or report anew after the consumer's debts have been discharged. The reporting of a discharged debt as outstanding or owing is often accomplished by creditors to continue collection of an otherwise unenforceable debt. A United States Bankruptcy Court cautioned, "Such a notation on a credit report is, in fact, just the type of creditor shenanigans intended to be prohibited by the automatic stay."[19]

**Collection and Transferred Accounts.**

An ongoing problem for the reporting of collection accounts is the date of status or delinquency. Many collectors "re-age" their accounts to report them as more recent than is accurate. This problem is common and frequent. Consumer debtors remain burdened with a serious derogatory account status far longer than the seven years the law would provide. This is especially unjust when the CRA continues to report a "paid" collection or "paid" chargeoff.

Similarly, many collection accounts or credit accounts transferred between creditors are reported without reference to the original creditor or account. In fact, many credit card furnishers such as Capital One and MBNA, now Bank of America, will report an account under a new account number after receiving a consumer's dispute. Debt collectors will add a new collection account that often contains no indication that it duplicates an existing tradeline. These changes and omissions circumvent corrections and blocks placed in a consumer's file by the CRA after a dispute.

---

[19] Matter of Sommersdorf, 139 B.R. 700 (Bkrtcy.S.D. Ohio 1991).

All of these above-described problems would not occur if the CRAs did not accept accounts reported without all of the fields required by Metro 2.[20]

### CRA PROCEDURES ARE INADEQUATE FOR HANDLING CONSUMER DISPUTES.

The intended scheme of the FCRA was one in which a consumer reporting agency could presume its information inaccurate until otherwise put on notice. However, when a consumer notified it of a dispute, the balance was to shift and the agency could not thereafter rely blindly on its creditor customer. Unfortunately, this statutory intent is now systemically ignored by the national reporting agencies.

The consumer's right to dispute information contained in a consumer report is an important safeguard necessary to ensure accuracy.[21] The legislative history rightly characterizes the dispute and correction process as "the heart of ... efforts to ensure the ultimate accuracy of consumer report."[22] The original intent of the FCRA's reinvestigation requirements and their societal importance were plainly stated by Senator Proxmire when the Act was first introduced in the Senate:

> It would be unrealistic to expect credit reporting agencies to be absolutely correct on every single case. But it seems to me that consumers affected by an adverse rating do have a right to present their side of the story and to have inaccurate information expunged from their file. Considering the growing importance of credit in our economy, the right to fair credit reporting is becoming more and more essential. We certainly would not tolerate a Government agency depriving a citizen of his livelihood or freedom on the basis of unsubstantiated gossip without an opportunity to present his case. And yet this is entirely possible on the part of a credit reporting agency.

115 Cong. Rec. 2412 (1969).

Despite the acknowledged importance of the FCRA reinvestigation procedures, the current dispute process is not reliably effective. One study found that ninety-four percent of consumer complaints concerning consumer reporting involved uncorrected errors in reports, and the average consumer had already contacted the CRA over three times--and waited without results for averages of between twenty-three to thirty-one weeks--before complaining to the FTC.[23]

---

[20] In fact, in order to accommodate Capital One, the CRAs actually changed the designation of the "credit limit" field in the Metro 2 Manual from mandatory to optional.
[21] In re: Equifax, Inc., 96 F.T.C. 1045, 1065 (1980), *rev'd in part on other grounds*, 678 F.2d 1047 (11th Cir. 1982).
[22] Committee Report accompanying S.650, S. Rep. No. 185, 104th Cong. 1st Sess., at 43 (Dec. 14, 1995).
[23] U.S. Public Interest Research Group, Credit Bureaus: Public Enemy #1 at the FTC (Oct. 1993).

***The FCRA Requires a CRA to Conduct a Meaningful and Independent Investigation.***

Restated, with superfluous text removed, Section 611(a) of the FCRA (15 U.S.C. §1681i(a)) imposes on a CRA upon receipt of a consumer's dispute the following duties:

> [T]he agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file.  §611(a)(2)(A).
> The notice [that the CRA provides to the creditor/furnisher after receiving the consumer's dispute] shall include all relevant information regarding the dispute that the agency has received from the consumer.  §611(a)(2)(A).
> The consumer reporting agency shall review and consider all relevant information submitted by the consumer. §611(a)(4).
> [The CRA must immediately remove disputed information if it determines that] the information that is the subject of the reinvestigation is [...] inaccurate or incomplete or [...] cannot be verified.  §§611(a)(2)(C) and 611(a)(5).

As written and applied, the FCRA reinvestigation section would seem unambiguous. If a consumer disputes the accuracy of information in a consumer report, the CRA must conduct an investigation.  The investigation is called a reinvestigation, presumably because the CRA initially added to its files the item of disputed information only after employing reasonable procedures to ensure maximum possible accuracy in the first place. Before the 2003 FACTA amendments to the FCRA, the Act did not expressly define a qualitative standard by which the CRA must reinvestigate.  The FACTA amendments clarified that the reinvestigation must be "reasonable."[24]  This addition was consistent with judicial interpretations of the pre-amendment provision.

Underlying the "reasonableness" of a CRA's compliance with its FCRA "accuracy" duties is a two step balancing test used expressly or implicitly by nearly every court to apply the statute.  The balancing test was formulated in 1994 by the Seventh Circuit in *Henson v. CSC Credit Services*:

> Whether the credit reporting agency has a duty to go beyond the original source will depend, in part, on whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable.  The credit reporting agency's duty will also depend on the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer.[25]

---

[24] 15 U.S.C. § 1681i(a), *amended by* Pub. L. No. 108-159, § 317 (2003); 16 C.F.R. § 602.1(c)(3)(xviii).
[25] 29 F.3d 280 (7th Cir. 1994).

-19-

These two factors--the degree to which the CRA has been alerted as to the unreliability of the information furnisher and the cost of verifying the inaccuracy against its possible harm to the consumer--provide the framework for nearly all judicial analysis applying the CRA's accuracy obligation, and especially interpretations of the FCRA's reinvestigation provisions. A CRA may be entitled to initially rely on an information furnisher because of the inordinate costs in independently verifying a nearly infinite pool of data.[26]  However, when a consumer makes a dispute to the CRA, the reasonableness of the CRA's conduct is measured against a heightened standard and the burden shifts to the CRA.[27]

Despite the lack of any statutory ambiguity, each of the national CRAs, Equifax, Trans Union and Experian, are not merely careless with their reinvestigation compliance duties. They entirely ignore them.  We recognize that the Committee will hear divergent positions from opposite parties in most of its deliberations.  But trust that none of the claims stated herein are without factual support.

### The CRAs _Never_ Conduct a 'Reinvestigation' and _Always_ 'Parrot' their Creditor-customers.

The most critical provisions in §611(a) are the mandate that a CRA conduct a "reasonable reinvestigation" and the requirement that the CRA "review and consider" the information provided by the consumer.  These provisions impose on a CRA the obligation to exercise independent discretion to evaluate the validity of a consumer's dispute.  The leading case considering the qualitative standard for a reinvestigation is <u>Cushman v. Trans Union</u>.  The Third Circuit stated in this 1997 decision:

> The "grave responsibilit[y]" imposed by [§611(a)] must consist of something more than merely parroting information received from other sources. Therefore, <u>a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute.</u> (emphasis added).

When confronted with this decision in litigation, CRA attorneys uniformly make two responses. First, they routinely claim that Congress implicitly repealed the requirement of an independent investigation when it added the FCRA's furnisher liability section in 1996. Secondly, they assert that their procedures do not defer entirely to the creditor and constitute something more than mere "parroting" of their customer's response.

---

[26] <u>Henson v. CSC Credit Servs.</u>, 29 F.3d 280 (7th Cir. 1994).
[27] <u>Cushman v. Trans Union Corp.</u>, 115 F.3d 220 (3d Cir. 1997).

While the first argument seems inconsistent with the statutory text and is more likely to be heard outside the spotlight of this Committee, the CDIA and its CRA directors will assert as they did to the FTC that their procedures involve an independent review and the exercise of discretion. Nothing could be further from the truth. If an industry representative makes such an assertion, the Committee should challenge same and demand a factual rebuttal to the following.

The three major nationwide CRAs all of their tradeline or creditor/collection disputes through an electronic dispute processing system, known as e-OSCAR (Online Solution for Complete and Accurate Reporting). E-OSCAR is owned by Online Data Exchange, L.L.C, a for-profit joint venture with owner ship divided equally amongst the Big-3 CRAs, plus a fourth CRA, Innovis. E-OSCAR is web-based and permits furnishers to communicate with the CRA over the Internet. These communications utilize standard forms with codes, Automated Consumer Dispute Verification forms (ACDVs)and Automated Uniform Data Forms (AUDFs). The CRA initiates a request for a reinvestigation with the furnisher by sending an ACDV through e-OSCAR.

The ACDV contains identifying information about the consumer in the CRA's file; one or two codes summarizing the consumer's dispute; and, if the CRA deems it necessary, a one-line free-form narrative field that supplements the dispute codes. This free-form field is sometimes referred to as the "FCRA Relevant Information field," but is rarely used. The CRAs' procedures manuals offer almost no instructions for their ACDV clerks as to what information should be placed in this one-line text field. As a result, the field is often left blank.

ACDV clerks at the CRA select a specific dispute code from among twenty-six offered by the e-OSCAR system, such as "Not his/hers" and "Claims account closed." These codes are often contained in a dropdown "pick list" and the criteria for selecting the appropriate pick list value for a certain dispute is often more specifically detailed in the procedures manuals.

The CRAs encourage consumers to submit disputes using a limited set of dispute codes, either contained in a pre-created dispute form enclosed with every consumer disclosure, or, more recently, by having the consumer submit a dispute over the Internet using a list of on-line check-boxes to select the basis for the dispute. When such a dispute is submitted over the Internet, there is usually no involvement of the CRA's personnel in the dispute process. The check-box selected by the consumer as most applicable to the dispute is matched to one of the pick-list

-21-

ACDV dispute codes and automatically sent to the furnisher without any human intervention. Likewise, regardless of whether the dispute is submitted on-line, via mail, or via telephone, the furnisher's response to the ACDV typically is automatically applied to the tradeline in question with minimal human intervention.

Of the three national CRAs, only Experian processes consumer disputes domestically. TransUnion receives disputes at its consumer relations facility near Philadelphia, scans the dispute into an electronic image and then transmits the image to Intelenet, its subcontractor located in Mumbai, India. Intelenet in Mumbai can connect directly to TransUnion's massive CRONUS database, retrieve a consumer's credit file and initiate the ACDV exchange. If a dispute falls into a certain category which requires "priority processing," such as when a consumer has a mortgage application pending, or the consumer falls with the VIP designation (e.g., a judge, attorney, or celebrity), Intelenet resends the electronic document back to the United States, where a TransUnion employee processes the dispute, albeit using the same CRA procedures manual that the Intelenet employees are contractually obligated to follow at the Mumbai facility. In either scenario, the furnisher's response to the ACDV is automatically reflected in the TransUnion database with no further interaction required and a letter confirming the results of the exchange is then mailed to the consumer.

Equifax maintains a similar dispute processing mechanism. The Equifax business rules require that the consumer's dispute is imaged by Innasource, based in Atlanta. A record of the dispute is logged into the consumer's file, and the dispute is then electronically transmitted to Jamaica, the Philippines, or Costa Rica. The foreign contractor accesses Equifax's database, retrieves the consumer's credit file and initiates the ACDV exchange as applicable. The results of the ACDV exchange are then auto-populated back into the tradelines.

None of these procedures attempt anything other than forwarding the coded "ACDV" to the respective creditor. In a March 2007 deposition, Equifax's Vice President described its entire "reinvestigation" process accordingly:

Q   What knowledge do you have as to the mechanics of how a DDC Filipino employee would process an Equifax dispute? [. . .]
A   The electronic image would be displayed on their screen. They would have an ACIS [Automated Consumer Interview System] screen that they would use. They would then look at the electronic image. They would they would read off the identifying information, enter [. . .] that ID information into the system, access that credit report. At

-22-

that point, they'd be able to determine if they were looking at the correct file. If they were, they'd go further. They'd read the letter, they gain an understanding of the issues at hand, and they'd look at the credit report to see if the credit report at that time reflects that. If it does, they would send those particular items from the data furnisher or furnishers. They would request that an investigation be started.

Q   Through the ACDV?

A   Through ACIS, the Automated Consumer Interview System.

Q   Okay. And then [. . .] they would check a claim code and fill in the relevant information box from the dispute letter?

A   Correct.

Q   And then the ACIS system, Equifax's own system, would then generate an ACDV out of that?

A   Correct.

Q   And then that is sent by automated means through e-OSCAR?

A   Correct.

Q   And that outsourced vendor's employee's job for that dispute is now finished?

A   Assuming they've addressed everything on the --

Q   Right. But they're not -- they're not going to handle whatever response the creditor may provide?

A   That's correct.

Q   Do DDC employees have telephones on their desk?

A   I do not believe so.

Q   As part of their compliance with Equifax's procedures, do DDC's employees telephone consumers as part of conducting a reinvestigation?

A   They do not.

Q   Do they telephone creditors, the furnishers, as part of conducting a reinvestigation?

A   They do not.

Q   Do they telephone anybody from outside DDC or Equifax as part of conducting a reinvestigation of a consumer dispute?

A   They do not.

Q   What about e-mailing any of those non-Equifax, non-DDC people, creditor, consumer, or third party?

A   They should not be -- they do not e-mail them.

Q   And what about fax machines?

A   [. . .} They do not have fax machines either.

Q   Under what circumstances will a DDC employee forward the consumer's actual dispute letter or documents the consumer provided to the furnisher, the creditor, as part of a reinvestigation?

A   A mechanism does not exist to forward the actual documents.

This is the same exact process used by each CRA. The only human intervention is to determine the appropriate two-digit code to enter in a computer message to the creditor. No independent discretion is exercised. No information is "considered" in the reinvestigation. The CRA agents

-23-

act only as data entry clerks to transfer the consumer's written dispute, of whatever detail, into one of the four primary dispute codes used over 90% of the time.

Each CRA has named its dispute processing manual by a unique name. I am endeavoring to provide Chairman Frank's office and the FTC the most recent complete and unprotected manuals I have in my possession. The pages I cite herein are also attached as an exhibit to this testimony. Experian's "Consumer Investigation Procedures Participant Guide" is the 2002 edition. Equifax's "Indicating Manual" is dated 2004 and Trans Union's "CRS Manual" is also dated 2004. While I have received and read the more recent CRA manuals, I am unable to share them as I remain bound by Protective Orders and CRA designations of such documents as confidential. If the Committee can obtain the agreement of the respective CRAs to release us from their designations, I will promptly provide the most recent manuals. Regardless, as is evident from the recent deposition testimony cited herein, the CRA procedures have not meaningfully changed. If anything, they have become more automated as the agencies have shifted all disputes to the E-Oscar ACDV system. Most of the details in these manuals relate only to how a CRA employee or outsource vendor is instructed to select appropriate dispute codes to send to the creditor. The descriptions of the other aspects of this 'reinvestigation' process are much shorter. For example, Experian lists four steps:

1. The consumer contacts Experian by phone, mail or the internet to request an investigation.
2. Experian notifies the creditor or public records vendor, via a Consumer Dispute Verification (CDV) form or an Automated Consumer Dispute Verification (ACDV) form of the consumer's investigation request.
3. The credit grantor checks their files or the public record vendor revisits the court to confirm or deny the consumer's claim. The A/CDV is returned to Experian with a response.
4. Experian sends the consumer, by mail, a Consumer Disclosure Final (CDF) with the creditor's or vendor's response.[28]

Trans Union's manual extends the Consumer Dispute steps to six and over four pages of its manual explains in relevant part:

1. Identify the Line item. ("[I]dentify the tradeline.")
2. Open the Disputes Screen.
3. Add Claim Code(s). ("Based on the information the consumer provides, select a Claim Code from the Claims drop-down list and chose Add.")

---

[28] Experian Consumer Investigation Procedures Participant Guide, 2002, p.7.

-24-

4. Add Consumer Comment. ("Add a Consumer Comment if the consumer provides additional details about the dispute that is not addressed by the current Claim Codes.")
5. Select an Address. ("If the subscriber/data furnisher has more than one address. . . The CDV will be sent to the displayed address.")
6. Finish opening the Dispute. ("Choose 'Done.'")[29]

What is of course missing from these procedures is the exercise of any discretion. The CRAs defer entirely to, or "parrot" their creditor-customers. If the creditor instructs the CRA to retain the information as reported, there is literally nothing the consumer can do to override that instruction. While the CRAs offer the claim that they will review the documents the consumer provides to determine if they are "acceptable" to allow a correction outside the ACDV process, the word "Acceptable" is a proper name for a specific category of documents listed in the CRA manuals. Essentially, for a consumer's dispute of a credit account tradeline, the only "Acceptable" documents are written letterhead communications from the creditor itself instructing the CRA to delete or correct the reported tradeline.[30] Further, the creditor letter would have to be more recent than the last date the creditor had otherwise "verified" the account.

In explaining the real world application of these procedures, Trans Union's employee who performed such dispute processing before such tasks were shipped to India explained:

Q.    [If the] consumer says, 'I dispute this credit card account, here's the account number, it belongs to my husband, not to me, what would you have done if you were complying with Trans Union's procedures in August '05?
A.    I would dispute the account with the appropriate clam code.
Q.    How would you do that?
A.    In the computer. [. . .] I would click on the account and select the appropriate claim code. Once you hit okay, it says open, which means the dispute on that account has been opened.
Q.    After you put the dispute code and click on the dispute, do you have any other role in the investigation or dispute process for that account?
A.    No.
Q.    It just gets sent onto the creditor, and your job as to that dispute is done, right?
A.    Correct.
Q.    It would be fair to say that if you were complying with Trans Union's policies, you're not as an investigator or as a dispute processor making any judgment calls or exercising any discretion about whether a consumer really owns the account? [. . .] You're not exercising that discretion?
A.    No. [. . .]
Q.    How does Trans Union instruct its employees to process the dispute?

---

[29] Trans Union CRS Manual, September 28, 2004, "Consumer Disputes", pp. 1-4.
[30] Trans Union CRS Manual, September 28, 2004, "Documents Acceptable for Maintenance", pp.1-4.

-25-

A.      In the system.
Q.      By taking the consumer's dispute, summarizing it into a claim or dispute code,
inputting that into the system and sending that code to the creditor?
A.      Correct.
Q.      Is there any other part of an investigation besides that that Trans Union has
instructed its employees is required?
A.      No.
Q.      What if the creditor and the consumer strongly disagree about whether a debt is
owed, consumer says that the debt's now owed, the creditor says yes, it is, what does
Trans Union do to determine who's correct?
A.      It's up to the creditor to make the decision.[31]

Experian's procedures are no more rigorous.  Its employee testified:

Q.      After you receive a dispute such as Exhibit 1[a multipage dispute letter with
nearly 60 pages of supporting documentation], if you were following Experian's mandate
or requirement, you would plug the information into the computer, the name, address and
social, and pull up the file on the screen, correct?
A.      Yes.
Q.      You would then review to learn what items were being disputed, is that correct?
A.      Yes.
Q.      What is the next step that you would follow if you were obeying Experian?
A.      I would process the items. [. . .] I highlight on the [tradeline] item, and I enter the
option. [. . .]
Q.      What options do you have to choose from?
A.      I would choose the one 'the consumer states the item is not theirs due to fraud.'
Q.      So there is a list of multiple choice options that you would click on?
A.      Yes. [. . .]
Q.      And can you list some of the other multiple choice codes you could click on?
A.      [After estimating that there were as many as 15 dispute codes] There's one for
'not mine, for mixed file.'[32]

None of the CRAs follow procedures to consider and exercise discretion over a

consumer's dispute, even if it arose from fraud or identity theft.  When another CRA witness was

asked, "What does Experian intend for its employees to do in order for them to obtain and review

copies of the underlying documents on the dispute – from the creditor on the disputed account?,

the employee testified, "It's not Experian's policy to require or suggest that its agent ask for any

underlying documents.  Experian doesn't train its employees to do handwriting analysis or

---

[31] Mullins v. Trans Union, et al, Deposition of Selena Bazemore, September 21, 2006.
[32] Beck v. Experian, et al, Deposition of Brenda Hahlen, June 29, 2005.

-26-

various other investigative-type things that would be required of reviewing a credit application."[33]

### *CRA Procedures Twist the Meaning of "Accuracy".*

The CRAs also now contend that their credit reporting is "accurate' so long as it matches the data provided by their creditor customers. This is plainly contrary to prior judicial and FTC interpretations of the "accuracy" duty. A reinvestigation must be a good faith effort to determine the accuracy of the disputed item.[34] More is usually required than simply confirming that the disputed information was in fact reported as it was received from the original source. However, this is all that the CRAs do. A recent CRA witness testified:

> Q.      And how would they [Trans Union's employees] determine if the information is reported incorrectly?
> A.      Well, its not – it's to make sure that it's in the right field, the right code.
> Q.      Its not to determine –
> A.      It's mot to say the balance is correct on so and so's account, no.
> Q.      It's not to make sure that the underlying account data is accurate, right?
> A.      I don't believe it is, no.[35]

### *The CRAs Do Not Forward "All Relevant Information".*

Another requirement for a FCRA reinvestigation is that the CRA forward to the creditor furnisher "all relevant information" provided by the consumer. This is a critical and ongoing battle between consumers and the national CRAs. In fact, as is apparent from the CDIA emails, this was also a matter in contention between the FTC and the CRAs. The consumer's Catch-22 is as follows: If a dispute is made directly to the creditor, it is rarely taken seriously as there is no private remedy for a creditor's failure to comply with Section 623(a) (15 U.S.C. §1681s-29a)). Furthermore, the FTC has initiated only a single enforcement action against a furnisher since the 1996 amendments. However, when a consumer makes a dispute to the CRA, required to trigger the furnisher investigation provisions under Section 623(b), the CRA will reduce the dispute, no matter how detailed, substantive or documented, to an ACDV electronic message with one of a handful of dispute codes. Clearly, a CRA's refusal to forward all relevant documents and details of the dispute appears to violate the statute. The CRA response is to rely on a field in the ACDV

---

[33] Beck v. Experian, et al, Deposition of Kimberly Hughes, June 30, 2005.
[34] Curtis v. Trans Union, L.L.C., 2002 WL 31748838 (N.D. Ill. Dec. 9, 2002); FTC Official Staff Commentary § 611 item 2.
[35] Mullins v. Tran Union, et al, Deposition of Eileen Little, September 21, 2006.

form that permits a "free text" comment by the CRA employee or agent. This box is limited to one line and a fixed number of characters. If you attempt an internet dispute and enter details in the free form box provided, you can see firsthand how limited this option really is. In addition, only a minority of ACDV's sent actually contain such a field. Trans Union's employee has testified that it is used less than 10% of the time and even then only if the consumer's dispute is not in a regularly selected category.[36]

What makes matters worse is the CRA collapse of the reinvestigation dispute codes from 100 choices under the old system, to 26 under E-Oscar. And of these twenty six choices, the <u>CRAs use the same four codes for nearly 90% of all disputes,</u> a fact the CDIA emails evidence they sought to conceal from the FTC. The percentage breakdown for the CRAs minimum number of codes is as follows:

| | |
|---|---|
| Not his/hers | 30.5% |
| Disputes present/previous Account Status/History | 21.2% |
| Claims Inaccurate Information. Did not provide specific dispute | 16.8% |
| Disputes amounts. | 8.8% |
| Claims account closed by consumer. | 7.0% |

As the CRA testimony cited above evidences, there is no mechanism in E-Oscar, used now for 100% of all creditor tradeline disputes, by which the CRA agent can or will forward documents to the furnisher or receive documents from the furnisher. Any claim to the contrary is not truthful. Trans Union's witness testified:

Q.     But, again, there is no mechanism at all of which you're aware by which the dispute investigator would send copies of the dispute or documents with the dispute onto the creditor?
A.     No.[37]

In fact, other than the unusual and rare "VIP" disputes handled by the CRA attorneys or legal support, there is never even human contact between the CRA and the creditor source.

This "all relevant information" problem has a real and significant impact on consumers. Often, it strips them of their rights to force the creditor to conduct the very investigation to which the CRA wants to defer. Several Federal Courts have dismissed consumer claims against

---

[36] *Id.*
[37] *Id.*

-28-

furnishers because of the generality of the CRA ACDV and its failure to forward the actual dispute and documents.[38]  The Seventh Circuit explained:

> Credit Control's investigation in this case was reasonable given the scant information it received regarding the nature of Westra's dispute. Credit Control received a CDV from Trans Union indicating that Westra was disputing the charge on the basis that the account did not belong to him. The CDV did not provide any information about possible fraud or identity theft or include any of the documentation provided to Trans Union by Westra. Credit Control verified Westra's name, address, and date of birth and sent the CDV back to Trans Union. Had Trans Union given Credit Control notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted.[39]

Similarly, in <u>Malm</u>, the Minnesota District Court held:

> While specific notice of Plaintiff's concerns could have compelled Sherman to conduct a more thorough review, thus creating an issue of "reasonableness" for the jury, a more rigorous investigation was not required here based on the superficial notice that Trans Union provided.[40]

The irony is that the CRAs attempt a justification of their deferential procedures by claiming that only the creditor has a substantive investigation duty even though they routinely refuse to forward sufficient, let alone all relevant information to the creditor source.

One argument the CRAs cannot assert is a technological or cost barrier to forwarding the consumer's dispute and supporting documents.  First, all three CRAs currently scan and archive the consumer's dispute and documents.  There is no greater storage or archive space required.  There is also no technological obstacle to forwarding the dispute and documents electronically.  Equifax and Trans Union already do so to India and the Philippines.  Sending them concurrently to domestic furnishers would not require nearly as much bandwidth and resource devotion.  Even beyond these obvious conclusions, we have as well provided the Committee the Proposed Statement of Work drafted by the CRA's E-Oscar vendor, A.T. & T. in 2005.  A fix to the E-Oscar system to enable it to include the dispute letters and documents has already been designed.  The CRAs need only to implement it.

There are no reasonable privacy objections to forwarding consumer dispute letters to multiple creditors.  Each subscriber will have already been the subject of the verification

---

[38] <u>Westra v. Credit Control of Pinellas</u>, 409 F.3d 825 (7th Cir. 2005); <u>Malm v. Household Bank, N.A.</u>, No. 03-4340 2004 U.S. Dist. LEXIS 12981 (D. Minn. July 7, 2004).
[39] <u>Westra</u>, 409 F.3d at 827.
[40] <u>Malm v. Household Bank, N.A.</u>, No. 03-4340 2004 U.S. Dist. LEXIS 12981 (D. Minn. July 7, 2004).

provisions of the FCRA to ensure the security of consumer data. Furthermore, the CRAs cannot feign a privacy concern when they would already willingly sell a consumer's entire credit file to a subscriber who provided only a name and address.

### *CRA Reinvestigations are Solely Cost Driven*

The CRA reinvestigation procedures have been implemented and have evolved towards two ends – customer satisfaction and cost. The first motivation is explained by the CRA ambition for greater revenue. The creditor who reports a delinquent account to the CRAs does so in the hope of collecting that debt.   And despite the growing profits in credit monitoring services, the CRAs make most of their money from these collecting creditors. For example, we learned in discovery that Trans Union received over $6 million per year from MBNA alone. The CRA has no interest in deferring to a consumer involuntarily captured in a relationship with the agency, when doing so could cause its paying customer to lose collection opportunities and profits.

Equally important is the CRA desire to reduce costs and limit the allocation of resources for functions that do not produce revenue. Until recently, with the move of E-Oscar into a for-profit entity, the reinvestigation function has been seen only as a cost burden, to be minimized and reduced as much as possible. While all three CRAs have taken similar directions, the changes made by Equifax are easiest to measure. Before mid-2004, when Equifax still handled some disputes in-house, its average cost per dispute was $4.67. By late 2004 and into 2005, Equifax was using an outsource vendor in Montego Bay, Jamaica, ACS. Its ACS reinvestigations cost the CRA only $1.08.[41] Now, after the move to DDC in the Philippines, Equifax pays only $.57 per consumer dispute letter, regardless of how many items or accounts are at issue. Trans Union has a different contractual relationship with its outsource vendor. It pays the Indian company a flat $8.00 per man-hour the vendor incurs, but it maintains rigorous production standards the vendor must meet. In addition, nearly all disputes are now conducted by electronic automated means, eliminating the need for human involvement and the expense of a paper enterprise. These dramatic reductions in cost per dispute described above have all come during a period of rising identity theft and fraud disputes.

---

[41] Faile v. Equifax, Deposition of Gary Poch, March 13, 2007.

Litigation discovery has also revealed quota systems used by the CRAs to force employees to process disputes rapidly and without meaningful inquiry.  For example, Experian uses a system to measure the number of "converted units" produced by each employee.  Each task is assigned a different value. To meet Experian's minimum standards for a pay incentive if processing the most difficult of disputes – fraud and identity theft claims, the employee would have to perform at least 98.25 disputes per day, or 13.1 per hour.[42]  The quota minimum at Trans Union before it outsourced its reinvestigation function was between 10 to 14 dispute letters per hour.[43]

This is as much "cost" information as consumers have yet discovered.  In fact, in two recent cases, Beck v. Experian and Faile v. Equifax, both CRAs claimed to not maintain budgets, projections or gross cost estimates for their reinvestigation functions.  While this claim is incredible, so long as the agencies continue to assert it, they cannot reasonably argue that a substantive and improved reinvestigation process would be cost prohibitive.

### The 'Red-Herring' of Credit Repair Clinics

A final retreat for the CRA defense of the shallow investigation system is the industry boogieman, "Credit Repair Clinics."  Currently, these are of far less consequence than they may have been five years ago. Still, the CRA concern about credit repair clinics is not entirely unfounded.  Pseudo-law firms such as the Lexington Law Group and its protégé deceptively market false promises to obtain the removal of otherwise accurate credit data.  However, the CRAs have long ago adapted their procedures to these problem disputes.  They each have detailed procedures manuals to train employees and agents to spot these disputes.  The credit repair disputes to which the CRAs and the CDIA often refer are generic disputes making a claim such as "This account is inaccurate" with nothing more and are thus easily separated from most disputes.

We do not argue that such an unsupported dispute, without more would require anything other than confirmation from the reporting source.  In fact, the FCRA already permits a CRA to refuse to delete or reinvestigate disputed information if the CRA "reasonably determines" a dispute is frivolous or irrelevant.[44]  The FTC Staff Commentary states that CRAs must assume

---

[42] Beck v. Experian, et al, Deposition of Kimberly Hughes, June 30, 2005.
[43] Evantash v. Trans Union, et al, Deposition of Eileen Little, January 25, 2003.
[44] 15 U.S.C. § 1681i(a)(3).

-31-

that a consumer's dispute is bona fide, unless there is evidence to the contrary.[45]  Such evidence
may consist of receipt of letters disputing all information in the file without allegations
concerning the specific items in the file.[46]  Other evidence, according to the FTC Staff
Commentary, would be a dispute made by a common format suggesting that a "credit repair"
organization or similar entity is counseling consumers to dispute all items in their files,
regardless of whether the information is known to be accurate.[47]

## REGULATORY ENFORCEMENT HAS BEEN INEFFECTIVE

More than any other factor, the growing permissiveness of the FTC has emboldened the
national CRAs and their creditor customers to forgo more cumbersome or substantive FCRA
compliance.  As drafted, the statute would appear powerful, and for years earlier it was.  For
example, between 1991 and 2000, the FTC vigorously prosecuted violations of the FCRA by the
three national CRAs and obtained multiple consent injunctions.  It targeted mixed file problems.
It succeeded in forcing reallocation of resources to the CRAs' reinvestigation responsibilities.
With modest exceptions, as regards Equifax, Trans Union and Experian, the Commission has
been largely silent since.

This has been a mistake.  Federal Judges in cases prosecuted by the FTC have injunctive
power.  The majority of courts to consider whether individual consumer cases present such
remedy have concluded that there is no such injunctive relief.  While I can represent my client to
obtain monetary damage, the FTC can force a systemic change for the benefit of all consumers.

The FTC has also failed to challenge CRA and creditor noncompliance when preparing
the several reports required by FACTA.  The most important of these, the FTC/FRB Joint
Reinvestigation Report concluded hesitantly that there may or may not be a problem with the
reinvestigation process.  But it did so by ignoring or failing to affirmatively seek out more
substantive contributions from consumers and the organizations that represent them.  Upon
receipt of traditional public comments, the FTC staff then worked side by side with the Big 3
CRAs, through the CDIA, to compose and justify the Report analysis and conclusions.

We do not imply any malevolent objective or temperament of the FTC.  In fact, it appears
that the Commission's ambitions were fair-minded and well motivated.  However, the regulators

---

[45] *See* FTC Official Staff Commentary § 611 item 11.
[46] FTC Official Staff Commentary § 611 item 11.
[47] *Id.*

have deferred naively to the National CRAs and the CDIA believing wrongly in their objectivity and institutional integrity. We have produced for the Committee a number of communications between the CDIA and the National CRAs that run the organization, each discussing the FTC/FRB effort and report. Each communication by the FTC staff is documented and discussed. While it is apparent that the FTC was acting and operating under the assumption that the CDIA responses were open and reliable, it is now equally apparent that the opposite was true. On numerous occasions documented in these inside exchanges, the CRAs' General Counsel and Government Relations attorneys instructed the CDIA to withhold, disguise or misstate data to the FTC. For example, when the FTC attorney requested an explanation for and sought data pertaining to the increasingly limited number of E-Oscar dispute codes used, the CDIA and the CRA attorneys did not want the FTC's Tom Kane to learn that 90% of their disputes used the same five generic codes. Instead, they removed the percentages, and added four additional codes that are rarely if ever used to imply deceptively that the CRAs use a broader range of descriptions to convey consumer disputes.

On another occasion, after the FTC had requested current dispute statistics, Equifax's General Counsel and its Chief Privacy Officer wrote between one another:

> Mr. Mast (Equifax):   "What is the cause in the dramatic change in the data verified percentage? Would seem best to leave [FTC's] Kane with the published older material."
> Mr. Goerss (Equifax): "I'll look into this. Agree that we need to provide him with the most favorable statistics."

Given the difficulties faced by Mixed File victims, it is also telling that the CRAs avoided an explanation to the FTC about how a Mixed File victim could obtain relief through the reinvestigation process. In drafting the Reinvestigation Report, the FTC requested from the CDIA a sample ACDV form showing a typical consumer dispute. On first draft, the CRAs had prepared an ACDV for a Mixed File inaccuracy. However, more calculating heads prevailed and the ACDV with mixed file implications was replaced with one for a simpler problem – a straight ownership dispute. Experian's attorney stated: "I thought we had discussed going with a different example. This one had a lot of identity issues going on (name, SSN) which may raise a lot of 'what do you do when?' questions. Weren't we going to use a simpler dispute to demonstrate a sample form?"

-33-

These examples are indicative of the way in which Tom Kane's and the FTC's trust was substantively betrayed through its CDIA exchanges.

The FTC also failed to ask tough questions or to demand the CRA manuals and information provided in this written statement. If the CRAs would not provide their procedures, witness testimony or reinvestigation statistics to the FTC on request, it could certainly have looked elsewhere. Instead, the Commission considered the issues raised in NACA's 2003 testimony and solicited from the CRAs a "Rebuttal" to same.

Similarly, the FTC mistakenly allowed its FACTA Accuracy Report to serve as a defense of the industry's Mixed File problems. The FTC concluded that stricter rules on matching identifying information would result in fewer mixed files, but also result in an increase in cases where no matches were found or "no-hits." The FTC noted that some "no-hits" reflect cases where identity theft may be prevented, but remarkably concluded contrary to the generally held views of Identity Theft, Privacy Rights and consumer advocacy groups that in most cases a no-hit does not provide a benefit to consumers.

Finally, the FTC also deferred to the unsupported assertions of the national CRAs when rejecting consumer requests to require the delivery of the actual credit reports used in a credit denial rather than a differently matched product. Credit reports are furnished in electronic form and rarely look much like what the consumer actually receives. In fact, the CRAs use an entirely different algorithm and in one case even a different database to create the "free credit reports" they provide to consumers. The result is that the creditor often receives a materially different report than that provided to the consumer. For example, in 2003 I discussed the case of Teresa Davis. Ms. Davis, then in the Air Force, was denied credit at her local credit union. She was told that it was based on an Equifax credit report and was because of an outstanding collection. She requested a copy of her free Equifax report and was told in same that she had perfect credit. She again applied and again suffered the denial. It was only after three such attempts that she was able to obtain the bank's copy of the report and saw that it contained different data than that provided to her from the CRA. From the perspective of a litigation advocate, this issue is often a difficult one. The CRAs claim to wipe the creditor report from their files after 90 days even though they retain indefinitely every consumer disclosure report they provide to the consumer. When a consumer plaintiff then attempts to use their disclosure as evidence of what the CRA

-34-

would have reported to the third party creditor, the CRA will object and explain that the reports may contain different data.

In FACTA, the Congress asked the FTC to consider the possibility of requiring CRAs to provide to consumers copies of the same reports actually used by the creditor who made a credit denial. This is an especially important issue for consumers such as Mr. Carroll and other mixed file/identity theft victims who might not otherwise understand or learn the real reason for a credit denial. The CRAs fought this, most certainly out of fear of empowering consumer claimants. The argument that they cannot logistically accomplish the archive of such reports is dishonest. All three CRAs maintain all reports they provide to consumers. They maintain at least monthly "snapshots" of a consumer file in one instance as far back as 1989. They retain all dispute documents sent by consumers, all contracts between the agency and their customers, limitless dispute historical data and a wealth of other information far more burdensome than that sought by consumers in these regards. Regardless, as at least two CRAs already retain all such report histories for 90 days, the data is already available to them when a consumer requests their report within 60 days of suffering a credit denial. Had the FTC offered consumers and more knowledgeable consumer groups, or at least required complete procedures data from the CRAs, it could not have reached the conclusion it did.

### RECOMMENDATIONS

Given the range of issues confronting this Congress generally and this Committee specifically, it is our suggestion that the FCRA demands only a small number of immediate improvements, having little cost impact on industry, but offering considerable benefit to consumers. While much has been stated already herein, NACA adopts further the regulatory recommendations of the National Consumer Law Center, with whom we share a public interest.

#### *Clarify that the FCRA Provides Injunctive Relief.*

The first limitation of the FCRA that must be corrected is the failure of Congress to explicitly state that United States District Courts retain their injunctive power in individual FCRA cases. Currently in most jurisdictions, a consumer has no alternative to seeking a monetary judgment as a remedy for a FCRA violation and resulting credit inaccuracies. Even in the most egregious circumstances, most courts have found no judicial means to correct systemic violations. While it is likely that Congress never intended to so divest Federal Courts of their

-35-

injunctive powers, there is judicial confusion that can be corrected with a short addition to the statute expressly acknowledging such a remedy. This would provide a faster and less burdensome remedy for consumers and ease the growing FCRA trial burden in the federal courts.

### Correct FACTA Scrivener's Error and Continue to Require of Adverse Action Notices.

The Committee should also correct a second error, this one created in the FACTA codification process. When Congress added a new requirement that mortgage companies provide adverse action notices on counter-offers, it included a provision that stripped the new requirement of a private cause of action. However, because FACTA was drafted with the casual use of the word "Section" to mean this new provision, instead of a clearer "Sub-paragraph" or "Sub-section", some Courts have concluded that the Plain Language of FACTA repealed the private cause of action for every provision in Section 615. This would include the longstanding requirement that a creditor send a denial letter informing a consumer of his right to a free credit report and to make a dispute of inaccurate information in same. Section 615(a).

### Clarify that the CRA Reinvestigation Duties are Substantive

Beyond these drafting fixes, NACA believe that either this Congress or the FTC must restate by Statutory amendment, Committee Report, or even informal Regulatory Guidance the following otherwise apparent constructs:

The reinvestigation requirement requires a discretionary inquiry by the CRA into the underlying accuracy of reported data and not merely a determination as to whether or not CRA reporting matches furnisher reporting.

The FCRA's reinvestigation requirement requires the CRA to forward consumer disputes and supporting documents to a furnisher in a manner that provides the furnisher all of the information provided by the Consumer.

### Require CRAs to Provide Actual Credit Report or Data Used to Take the Adverse Action.

Congress must consider requiring the CRAs to furnish to consumers requesting their post-denial free report under the FCRA, the same report data provided to the creditor.

### Enforce the FCRA's Accuracy Requirements to Reduce Mixed Files.

The FTC must return to its 1990's efforts to regulate the national CRAs in a manner to reduce mixed files.

### *Enforce the Federal Credit Repair Organizations Act*.

In light of industry concerns about Credit Repair Clinics, the FTC should consider more aggressive investigation and prosecution of violations of the Federal Credit Repair Organizations Act.  This is an ambition our organization, NACA, which bars credit repair clinics from its membership, can share with the national CRAs.

**Leonard A. Bennett,** *Consumer Litigation Associates, P.C.,* 12515 Warwick Boulevard, Newport News, VA 23606, Office (757) 930-3660, Facsimile (757) 930-3662. Email lenbennett@clalegal.com

George Mason University School of Law and Economics, Arlington, Virginia: J.D. 1994. Admitted to Virginia State Bar 1994. Admitted to North Carolina State Bar 1995. Admitted to United States Supreme Court, United States Courts of Appeal for the Third and Fourth Circuits, and U.S. District Courts in Virginia, North Carolina, Wisconsin, Illinois and Michigan. Admitted *pro hac vice* in jurisdictions across the country including California, Arizona, South Carolina, Rhode Island, Connecticut, Ohio, Wyoming, Maryland, Alabama, Wisconsin, Pennsylvania and Washington. Member National Association of Consumer Advocates (NACA) and various state Bar Associations.

Speaker and Panelist at numerous state and national seminars and consumer law courses, including regular invitations to speak at the NACA Fair Credit Reporting Act and Auto Fraud conferences, the National Consumer Law Center's Consumer Law conferences; CLE programs for the ABA and various state Bars:

**2007**

- Washington State Bar, Consumer Law CLE, Invited Speaker, July 2007, *Fair Credit Reporting Act.*

- National Association of Consumer Advocates, *Fair Credit Reporting Act National Conference, Multiple Panels*;

- U.S. Army JAG School, Charlottesville, Virginia, Course Instructor, *Fair Credit Reporting Act.*

- Georgia State Bar, Consumer Law CLE, Speaker, *Fair Credit Reporting Act.*

**2006**

- Contributing Author, *Fair Credit Reporting Act, Sixth Edition*, National Consumer Law Center

- National Consumer Law Center, National Consumer Rights Conference, Miami, FL, Speaker for Multiple Sessions, *Fair Credit Reporting Act,*

- Texas State Bar, Consumer Law CLE, Speaker, *Federal Claims in Autofraud Litigation*

- Santa Clara University Law School, Course, *Fair Credit Reporting Act.*

- Widener University Law School, Course, *Fair Credit Reporting Act.*

-38-

- United States Navy, Navy Legal Services, Norfolk, Virginia, *Auto Fraud*;

**2005**

- Missouri State Bar CLE, Oklahoma City, Oklahoma, *Fair Credit Reporting Act*;

- National Consumer Law Center, National Consumer Rights Conference, Boston, Mass. *Fair Credit Reporting Act Experts Panel*; and *ABC=s of the Fair Credit Reporting Act.*

- National Association of Consumer Advocates, *Fair Credit Reporting Act National Conference*, New Orleans, Louisiana, *Multiple Panels*;

- United States Navy, Naval Justice School (JAG Training), Newport, Rhode Island, *Consumer Law.*

**2004**

- American Bar Association, Telephone Seminar; A*Changing Faces of Consumer Law*@,

- National Consumer Law Center, National Consumer Rights Conference, Boston, Mass.

- *Fair Credit Reporting Act Experts Panel*; and ABC=s *of the Fair Credit Reporting Act.*

- National Association of Consumer Advocates, *Fair Credit Reporting Act National Conference*, Chicago, Illinois; *Multiple Panels*

- Oklahoma State Bar CLE, Oklahoma City, Oklahoma, *Identity Theft*;

- Virginia State Bar, Telephone Seminar, *Identity Theft.*

- United States Navy, Naval Justice School (JAG Training), Newport, Rhode Island, *Consumer Law*

- United States Navy, Navy Legal Services, Norfolk, Virginia, *Auto Fraud*;

- Virginia State Bar, Richmond and Fairfax, Virginia, *Consumer Protection Law*;

- Michigan State Bar, Consumer Law Section, Ann Arbor, Michigan; *Keynote Speaker.*

Presented NACA=s Congressional Testimony before House Committee on Financial Services, A*Fair Credit Reporting Act: How it Functions for Consumers and the Economy*@, June 4, 2003, Proposed Amendments to the Federal Fair Credit Reporting Act, http://financialservices.house.gov/media/pdf/060403lb.pdf.

United States House of Representatives
## Committee on Financial Services

### "Truth in Testimony" Disclosure Form

Clause 2(g) of rule XI of the Rules of the House of Representatives and the Rules of the Committee on Financial Services require the disclosure of the following information. A copy of this form should be attached to your written testimony.

| 1. Name: | 2. Organization or organizations you are representing: |
|---|---|
| Leonard A. Bennett | National Assoc. Consumer Advocates |

**3. Business Address and telephone number:**

12515 Warwick Blvd, Suite 100
Newport News, VA 23606

| 4. Have you received any Federal grants or contracts (including any subgrants and subcontracts) since October 1, 2004 related to the subject on which you have been invited to testify? | 5. Have any of the organizations you are representing received any Federal grants or contracts (including any subgrants and subcontracts) since October 1, 2004 related to the subject on which you have been invited to testify? |
|---|---|
| ☐ Yes   ☑ No | ☐ Yes   ☑ No |

**6. If you answered "yes" to either item 4 or 5, please list the source and amount of each such grant or contract, and indicate whether the recipient of such grant was you or the organization(s) you are representing. You may list additional grants or contracts on additional sheets.**

**7. Signature:**

*Please attach a copy of this form to your written testimony.*